911 P.2d 85

**Rose M. ROMERO, Plaintiff–Appellee/Cross–Appellant,**

**v.**

**Kamran HARIRI, Defendant–Appellant/Cross–Appellee,**

and

**Leo Parenti, and Doe Defendants 1–24, Defendants.**

No. 16658.

Intermediate Court of Appeals of Hawai'i.

Jan. 16, 1996.

Wm. Patrick O'Connor, on the briefs, Honolulu, for Defendant–Appellant/Cross–Appellee.

Earl I. Anzai, on the briefs, Robert K. Merce, Honolulu, for Plaintiff–Appellee/Cross–Appellant.

Before BURNS, C.J., and ACOBA and KIRIMITSU, JJ.

KIRIMITSU, Judge.

Defendant–Appellant/Cross–Appellee Kamran Hariri (Defendant) appeals from an October 29, 1992 Judgment entered in favor of Plaintiff–Appellee/Cross–Appellant Rose M. Romero (Romero). On cross-appeal, Romero challenges the trial court's October 29, 1992 order denying her motion for attorneys' fees. We affirm the October 29, 1992 Judgment and the October 29, 1992 order denying Romero's motion for attorneys' fees. We begin with Defendant's appeal.

## I. DEFENDANT'S APPEAL

### A. *Background*

On or about July 24, 1987, Defendant's real estate broker's license was revoked by the State of Hawai'i (the State) for deceptive business practices. At the same time, Beneficial Realty, Inc. (Beneficial), where Defendant was the principal broker, had its real estate license suspended by the State. Both Defendant and Beneficial did not have their licenses reissued or reinstated.

In early February 1988, Romero and Defendant met and became romantically involved. Defendant told Romero that "he was a realtor and had expertise in the real estate business." A few months after they met, Romero purchased a condominium unit in the "Waiau Gardens Kai" complex for $100,000. Through this transaction, Beneficial was paid a $3,000 commission.

Romero also owned a home on Hapaki Street. On May 16, 1988, she refinanced the mortgage on her Hapaki Street property for $150,000. After paying off the first mortgage, she received $93,345.30. This money was deposited in an interest bearing account at the rate of seven percent while Defendant searched for suitable real estate investments.

During October 1988, Romero purchased Apartment No. 1521 in the Island Colony condominium project for $85,000 (Island Colony Apartment). Romero paid a $35,000 down payment with the remaining balance payable in monthly installments. On November 5, 1988, Romero entered into an Option to Purchase agreement with Beneficial for the Island Colony Apartment. The agreement gave Beneficial an option to purchase the apartment for $85,000. The option was good until December 15, 1991. In addition, Beneficial agreed to rent the apartment

for $1,260 per month beginning in December 15, 1988. Defendant asserts in his opening brief that this lease-option arrangement with Beneficial was temporary and to be replaced by "new ones as soon as his pending petition for change of name to LEO PARENTI [ (Parenti) ] was approved by the State of Oregon."

A month and a half after purchasing the Island Colony Apartment, Romero purchased Apartment No. 411 in the Marine Surf Waikiki condominium project for $75,000 (Marine Surf Apartment). She paid a $22,500 down payment and obtained a mortgage loan from First Nationwide Bank for the remaining balance. The mortgage was recorded on December 19, 1988.

On February 20, 1989, Romero entered into two separate Lease and Option to Purchase Agreements (Options) with Parenti. The Options gave Parenti's address as "333 South State St., # 273, Lake Oswego, OR 97034[.]" The first Option provided that Parenti had the option to purchase the Island Colony Apartment commencing on March 1, 1989 until November 15, 1991, for $85,000. The second Option gave Parenti the option to purchase the Marine Surf Apartment for $80,000 between March 1, 1989 and March 1, 1992. The Options indicated that Parenti obtained the option to purchase the two properties after paying Romero $6,000 for each agreement. On July 24, 1989, notarized copies of the Options were recorded with the land court. A notary from Washoe County from the State of Nevada certified that Leo Parenti appeared before him on April 11, 1989, and that this person was the one "described in and who executed" the Options.

On August 30, 1989, Parenti sent a notice of intent to exercise his option to purchase the two apartments to Glenn Ajimine (Ajimine) of Title Guaranty. Ajimine informed Romero of the request and on September 5, 1989, "[Romero] wrote to Ajimine instructing him to hold off Parenti's request to exercise option to buy." Romero hired a private investigator who discovered that Defendant's real estate license was revoked by the State

in 1987 and that Defendant "had a pattern of using other aliases in conducting business." Romero also retained a handwriting expert who "opined [that] Parenti's signatures were those of Defendant[.]" As a result, "[o]n September 25, 1989, [Romero] wrote to Ajimine requesting the two leases with option to buy and the agreements of sale be considered invalid[.]"

On March 23, 1990, Romero filed a complaint against Defendant seeking an order from the circuit court declaring the Options void. The complaint alleged, *inter alia,* fraud, breach of fiduciary duty, unfair or deceptive practices, and intentional or negligent infliction of emotional distress. Romero asserted that Defendant induced her to invest in real estate through deception and misrepresentation; that Defendant did not disclose that his real estate license was revoked, or that Parenti was the same person as Defendant. Romero also alleged that Defendant's actions "raise the presumption of conscious indifference to the consequences, requiring the imposition of punitive damages." On March 27, 1990, Romero filed a Notice of Pendency of Action with the circuit court concerning the Island Colony and Marine Surf Apartments. On May 24, 1990, Defendant filed an answer denying Romero's allegations but admitting that "Parenti" was his alias.

On June 19, 1992, an advisory jury returned a special verdict in favor of Romero. The special verdict awarded general, special, and punitive damages. On July 7, 1992, Defendant filed a motion for remittitur on the award of damages. On October 29, 1992, Defendant's motion for remittitur was granted in part by the trial court when it reduced the special verdict's award of general and special damages and was denied in part when it did not disturb the award of punitive damages. Also on October 29, 1992, Judgment was entered in favor of Romero wherein the trial court awarded her $25,412.33 in special damages, $20,000 in general damages, and $1,000,000 in punitive damages.[1] Romero

---

1. The trial court has "discretion wholly whether to accept or reject, in whole or in part, the verdict of the [advisory] jury." 9 C. Wright & A.

Miller, *Federal Practice and Procedure: Civil* § 2335, at 212 (2d ed. 1994). *See* Hawai'i Rules of Civil Procedure (HRCP) Rule 39(c). The trial

was also awarded $16,385.37 in prejudgment interest and $9,033.50 for costs. The circuit court also declared the Options null and void *ab initio*. On November 27, 1992, Defendant timely filed his notice of appeal.

### B. *Discussion*

On appeal, Defendant argues that the trial court erred in (1) limiting Defendant's direct testimony, (2) denying Defendant's motions for directed verdict at the end of Romero's case on the issues of fraud and negligence, (3) rendering erroneous findings of fact and conclusions of law on fraud and breach of fiduciary duty, (4) denying Defendant's motion to join indispensable parties, and (5) denying Defendant's motion for remittitur of the punitive damage award. We consider each issue in turn.

### 1. *Defendant's testimony.*

Defendant asserts on appeal that the trial court erred in limiting the scope of Defendant's testimony when he was called to the stand to present his case. As a result, Defendant was "prevent[ed] ... from putting on any defenses to the various claims asserted by [Romero]." We disagree.

 It is well established that the trial court "has substantial discretion in exercising its control over the interrogation of witnesses" under Hawai'i Rules of Evidence (HRE) Rule 611(a). *Aga v. Hundahl,* 78 Hawai'i 230, 243, 891 P.2d 1022, 1035 (1995). Such control is necessary "so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." HRE Rule 611(a). "The intent [of the rule] is to define broad objectives and to leave the attainment of those objectives to the discretion of the [trial] court." Commentary to HRE Rule 611(a).

 Our review of the trial record indicates that the trial court properly exercised its discretionary authority to control the presentation of evidence to avoid needless consumption of time. Trial began on Friday, July 12, 1992. Romero called Defendant as her first witness and treated him as an adverse party witness. Near the end of Defendant's direct testimony, the trial court asked defense counsel to choose one of three alternatives to prevent Defendant from needlessly repeating portions of his direct testimony: (1) have Defendant testify about everything during cross-examination, including his side of the case; (2) defer cross-examining Defendant until he is called to testify in support of his case; or (3) have Defendant testify on cross-examination immediately following his direct testimony on matters concerning the direct examination; then, recall Defendant to the stand during his portion of the case and limit his testimony to matters not covered during his appearance for Romero's case. After it ensured that defense counsel understood the three alternatives, the trial court instructed defense counsel to choose one of the alternatives at the end of Defendant's direct testimony. After Romero's counsel finished with Defendant's direct examination, defense counsel informed the trial court that he would cross-examine Defendant after the direct testimony. Defense counsel indicated that Defendant would later be recalled to the stand to present a defense.

The trial court recessed the case for the weekend and on the following Monday Defendant was on the stand for cross-examination. To ensure that Defendant understood how the case would proceed, defense counsel inquired:

> [DEFENSE COUNSEL:] .... [T]he questions that I'm going to ask you are going to relate to the questions that you were asked on direct examination only. We will go into the presentation of your defense after [Romero] has an opportunity to present her case. Do you understand that?
>
> [DEFENDANT:] Yes.

court is required to issue findings of fact and conclusions of law, HRCP Rule 52(a), and "[r]eview on appeal is of the findings of the [trial] court as if there had been no verdict from an advisory jury." 9 C. Wright, *supra,* at 213. *See* part I.B.3, *infra*. The trial court, issued its findings of fact, conclusions of law, and judgment that essentially accepted the advisory jury's special verdict.

After Defendant finished with his testimony, Romero took the next two days to complete her case.

On July 17, 1992, Defendant presented his case. Defendant's counsel called Defendant to the stand. After Defendant was asked a few questions, Romero's counsel objected and a bench conference followed:

[DEFENSE COUNSEL:] [Defendant], I realize it's late in the day and we don't have much time, but what I would like you to do is you have just seen some numbers that were placed on the board here by [D]efendant's counsel indicating that you had received certain sums of money from the rental of these two apartments. Were you here during that period of time?

[DEFENDANT:] Yes.

[DEFENSE COUNSEL:] Now, I want you to explain to the jury how that transaction worked with regard to your supposedly receiving the amounts of money that are placed on there?

[DEFENDANT:] As they have done from the beginning of the case, from their opening statement on, they have misrepresented everything, including this.

[ROMERO'S COUNSEL:] Objection, Your Honor.

THE COURT: Sustained. Counsel, would you approach the bench please.

During the bench conference, the trial court reminded defense counsel that he was only to bring up matters not covered by Defendant's earlier testimony. Additionally, the trial court ruled that Defendant could testify about his observation of Romero's physical condition because this was not covered during Defendant's earlier testimony. However, instead of continuing with the presentation of evidence, defense counsel rested:

[DEFENSE COUNSEL]: [Defendant], I'm sorry. I have no questions.

THE COURT: Any further evidence?

[DEFENSE COUNSEL]: (No response).....

THE COURT: [Defense Counsel], do you have any further evidence?

[DEFENSE COUNSEL]: No, Your Honor, we have no further evidence at this time.

THE COURT: Then does the defense rest?

[DEFENSE COUNSEL]: Then [sic] defense rests.

Defendant maintains on appeal that the import of the trial court's ruling prevented Defendant from "asserting his right to respond to all of the evidence that had been presented against him by [Romero] and her other witnesses *after* Defendant had testified as an adverse party on her case." This is clearly not the case. The trial court merely reminded Defendant's trial counsel to not go into testimony that Defendant related earlier in the trial. Defendant was free to present any evidence as long as it was not previously covered. This was evident from the trial court's ruling allowing Defendant to testify regarding Romero's physical condition because this was not covered earlier. Defendant's counsel chose not to continue with the presentation of evidence on Defendant's behalf when he rested the defense's case. Thus, we hold that the trial court properly exercised its discretion to control the manner in which testimony was gathered from Defendant and that the trial court did not abuse its discretion in limiting Defendant's testimony during his presentation of his case to matters that were not previously covered.

### 2. *Directed verdict.*

At the conclusion of Romero's presentation of her case, Defendant moved for a directed verdict on the claims of fraud and negligence. The trial court denied the motions and Defendant asserts on appeal that this was error. We affirm.

■ We review denials of motions for directed verdict *de novo. Aga,* 78 Hawai'i at 237, 891 P.2d at 1029. " 'In deciding a motion for directed verdict[,] ... the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the non-moving party and ... [the directed verdict] motion may be granted only where there can be but one reasonable conclusion as to the proper judg-

ment.'" *Id.* (quoting *Richardson v. Sport Shinko (Waikiki Corp.)*, 76 Hawai'i 494, 502, 880 P.2d 169, 177 (1994)).

█ Regarding the allegation of fraud, Defendant maintains that he was entitled to a directed verdict because Romero failed to establish the elements of misrepresentation and reliance.[2] However, our review of the record indicates that the trier of fact could have reached more than one reasonable conclusion on whether the elements of fraud were satisfied. For example, Romero testified that Defendant never told her "at any time" that his real estate license was revoked nor that Defendant was actually Parenti. Further, Romero repeatedly expressed throughout her testimony how she trusted Defendant as a realtor. On the other hand, Defendant testified during cross-examination that early in his relationship with Romero, he told her that he was going to change his name to "Leo" but he did not mention a last name. Defendant also related that it was around this time that he told her that his real estate license had been revoked.[3] Drawing the inferences from the evidence in Romero's favor, we find that more than one reasonable conclusion can be reached on the issue of fraud. Consequently, we hold that the court correctly denied Defendant's motion for directed verdict with regards to fraud.

Similarly, we find that the evidence presented does not point to only one reasonable conclusion with regards to Romero's negligence claims against Defendant. Thus, we also hold that the trial court appropriately denied Defendant's directed verdict motion on the claim of negligence.

### 3. *Findings of fact and conclusions of law.*

Defendant quoted a series of findings of fact and conclusions of law entered by the trial court relating to fraud and breach of fiduciary duty in its statement of points on appeal and alleged that they were not "supported by the evidence, nor the applicable law[.]" Beyond this general allegation, Defendant's opening and reply briefs lacked an understandable discussion supporting this alleged error.

█ We review a trial court's conclusions of law under the right/wrong standard and its findings of fact under the clearly erroneous standard. *Nelson v. Boone*, 78 Hawai'i 76, 80, 890 P.2d 313, 317 (1995). "A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made." *State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995). We have reviewed Defendant's list and find no error with the trial court's findings of fact and conclusions of law.

### 4. *Indispensable parties.*

█ On July 7, 1992, the same day Defendant filed his motion for remittitur, Defen-

---

2. The necessary elements to establish a claim of fraud are: "(1) false representations were made by defendants, (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and (4) plaintiff did rely upon them." *Hawai'i's Thousand Friends v. Anderson*, 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989).

3. The testimony went as follows:

[DEFENSE COUNSEL:] You were also asked on direct examination about the use of the name Leo Parenti? When did you first discuss the name Leo with [Romero]?

[DEFENDANT:] Oh, that was early on in our relationship when—when we were discussing the various things, a couple of lawsuits that I had been involved in and things like that.

And I mentioned that I will be changing my name to—

[DEFENSE COUNSEL:] Did the name Leo come up?

[DEFENDANT] Yeah. She—I think she said, "What?" I said, "I think I will be changing it to Leo," and I don't believe we talked about the last name. It was just in a conversation.

[DEFENSE COUNSEL:] Okay. Did she say anything about the name Leo?

[DEFENDANT:] She said, "That sounds good."

[DEFENSE COUNSEL:] Did you at any time reveal to Miss Parenti your real estate—excuse me, to Mrs. Romero that your real estate license had been revoked?

[DEFENDANT:] That was during the same time or before. They were all related.

dant filed a motion for a new trial because an indispensable third party was not joined in the case. Defendant's motion and the memorandum in support did not expressly identify the indispensable party but alluded to third-parties claiming an interest in the property. An exhibit attached to the memorandum in support of the motion purports to be a letter dated February 21, 1991, addressed to Romero. According to the letter, Fort Worth Financial Corporation purchased the lease option contract for the Marine Surf Apartment "[l]ast year" and "now wish[ed] to exercise [their] option[.]" On August 19, 1992, the trial court entered an order denying Defendant's motion. On appeal, Defendant argues that the trial court erred in denying this motion. We disagree.

Defendant brought the present motion after the trial ended. "[A]fter the conclusion of a trial on the merits, there is reluctance on the part of an appellate court to overturn the trial court's decision as to indispensable parties, unless there is real prejudice to the absentee." *Almeida v. Almeida,* 4 Haw.App. 513, 516, 669 P.2d 174, 178 (1983). This reluctance is compounded by the fact that Defendant's motion was unclear in its description of the absent party and when this party obtained its interest to the property. As a result, we hold that the trial court did not err in denying Defendant's motion for a new trial for failure to join an indispensable party.[4]

4. Defendant's reluctance to indicate when an indispensable party may have acquired an interest in the property is likely due to the Notice of Pendency of Action concerning the Island Colony and Marine Surf Apartments filed by Romero on March 27, 1990, a few days after filing her complaint against Defendant. The notice was filed pursuant to Hawai'i Revised Statutes (HRS) § 634-51 (1993) which provides, "From and after the time of recording the notice, a person who becomes a purchaser or incumbrancer of the property affected shall be deemed to have constructive notice of the pendency of the action and be bound by any judgment entered therein if the person claims through any party to the action[.]"

5. Romero also testified that Defendant told people, "I don't do residentials, that's small stuff. I deal with big stuff like shopping centers and commercial buildings." Additionally, Defendant

### 5. *Punitive damages.*

Defendant's final contention on appeal challenges the award of one million dollars in punitive damages to Romero. Initially, we reject Defendant's assertion that the award of punitive damages is unsupported by the record. We are satisfied that Romero presented clear and convincing proof that Defendant "has acted wantonly or oppressively or with such malice as implies a spirit of mischief or criminal indifference to civil obligations, or where there has been some wilful misconduct or that entire want of care which would raise the presumption of a conscious indifference to consequences." *Masaki v. General Motors Corp.,* 71 Haw. 1, 16–17, 780 P.2d 566, 575, *reconsideration denied,* 71 Haw. 664, 833 P.2d 899 (1989).

Defendant also challenges the punitive award as excessive. Further, Defendant asserts that the record is devoid of evidence relating to "Defendant's financial status or condition" during the period of misconduct beyond Romero's testimony indicating that Defendant "is a multimillionaire."[5] The essence of this argument is that there was insufficient evidence of Defendant's financial condition to support the punitive damages award of a million dollars.[6]

The [well-accepted] test on appellate review as to whether the damages awarded by the jury were excessive is whether the award was "palpably not supported by the evidence, or so excessive and outrageous when considered with the circumstances of

showed Romero a book indicating that he was one of the top ten realtors in Hawai'i and Defendant gave her business cards that identified him as a consultant for business, real estate investments, and "Mortgage Loans Venture Capital[.]"

6. Defendant also argues that he was denied the opportunity to present evidence refuting Romero's testimony about his financial condition. But, as indicated in Part B.1., *supra,* Defendant was allowed to introduce evidence not covered during his earlier testimony but instead of eliciting testimony, Defendant rested his case. Furthermore, Defendant testified that he owned properties, was "heavily buying" real estate for himself, was investing in several Pearl City and Aiea projects, and had bought several units in Waiau Gardens. Such testimony serves to confirm Romero's testimony regarding Defendant's reputed wealth.

the case as to demonstrate that the jury in assessing damages acted against rules of law or suffered their passions or prejudice to mislead them."

*Kang v. Harrington,* 59 Haw. 652, 663, 587 P.2d 285, 292 (1978) (quoting *Vasconcellos v. Juarez,* 37 Haw. 364, 366 (1946)). In a jury-waived case, the same test is used "and the inquiry on review is limited to whether, 'upon the evidence adduced, reasonable men [and women] could have come to the same conclusion as the jury, or the trial court in a jury-waived case.'" *Id.* (quoting *Lima v. Tomasa,* 42 Haw. 478, 483 (1958)).

■ The failure to show net worth does not necessarily invalidate a punitive award but only eliminates a factor in which to gauge the reasonableness of the award. *Fahrenberg v. Tengel,* 96 Wis.2d 211, 291 N.W.2d 516, 527 (1980). *See also Ahmed v. Collins,* 23 Ariz.App. 54, 530 P.2d 900, 904 (1975) ("wealth of a defendant is only one factor which a jury may consider in assessing punitive damages"). Moreover, "[t]he plaintiff may generally show the reputed wealth of the defendant, and is not confined to proof of facts directly showing [the defendant's] financial condition." 22 Am.Jur.2d *Damages* § 953 (1988). As explained long ago by a Wisconsin court, "In most cases[,] evidence of reputed wealth would be the only evidence the plaintiff could make upon the point, and ... the defendant ... always has it in his [or her] power to present the real facts to the jury in answer to the general proof of the plaintiff." *Draper v. Baker,* 61 Wis. 450, 21 N.W. 527, 529 (1884). *See also Rogers v. Florence Printing Co.,* 233 S.C. 567, 106 S.E.2d 258, 262 (1958) (holding that punitive award not excessive and affirming principle that evidence of defendant's worth is information within his possession and defendant "should not be heard to complain that the jury made its award without such information, where he himself testified and did not offer it").

■ Romero was deceived by Defendant throughout their relationship. The only information she had about Defendant's financial worth was based upon his representations. Defendant had the opportunity, and was better able, to present evidence which accurately portrayed his financial status. We reject Defendant's argument that the punitive award is not supported by the evidence, for it was Defendant that failed to introduce proof of financial worth beyond that of Romero's testimony. Thus, we find the evidence presented regarding Defendant's financial condition to be sufficient to support the award of one million dollars in punitive damages against Defendant.

■ On the question of the excessiveness of the award, we considered the circumstances of the case and find that the advisory jury and the trial court, in assessing punitive damages against Defendant, did not act against rules of law or were influenced by their passions or prejudice. Further, we believe that after looking at the evidence, a reasonable person could have reached the same conclusion as the trial court. Consequently, we hold that the punitive award of one million dollars assessed against Defendant is not excessive.

Based on the foregoing, we affirm the October 29, 1992 Judgment against Defendant.

## II. CROSS–APPEAL

On July 7, 1992, Romero filed a motion for attorneys' fees and costs. On October 29, 1992, the trial court entered an order granting Romero's request for costs but denying her request for attorneys' fees. The trial court, during the hearing for Romero's motion, ruled, as follows:

THE COURT: The request for attorneys' fees is denied. Inasmuch as in a tort action plaintiff should not be awarded attorneys' fees, either as damages or as costs, and that is well settled and the exceptions to it, I do not find to be applicable or any to have been asserted in the memorandum.

After this ruling, the trial court also denied Defendant's motion for remittitur of the punitive damages award citing *Masaki, supra.* The trial court then provided an alternative basis for denying Romero's motion for attorneys' fees, indicating: "[T]he motion for attorneys' fees is denied inasmuch as the Court finds that the punitive damages will cover, not only the punishment and deterrence as-

pect, but other aspects for the purpose of punitive damage set forth at Page 8, Footnote 2 [of *Masaki* ]." On December 11, 1992, Romero filed a Notice of Cross–Appeal challenging the denial of her motion for attorneys' fees. We affirm.

## A. *Standard of Review*

 The trial court's denial of attorney's fees is reviewed under the abuse of discretion standard. *Weinberg v. Mauch,* 78 Hawai'i 40, 52–53, 890 P.2d 277, 289–90, *reconsideration denied,* 78 Hawai'i 421, 895 P.2d 172 (1995). " 'Discretion is abused whenever the court, in exercising it, exceeds the bounds of reason, all of the circumstances before it being considered.' " *Weinberg,* 78 Hawai'i at 53, 890 P.2d at 290 (quoting *Coll v. McCarthy,* 72 Haw. 20, 28–29, 804 P.2d 881, 887 (1991)) (internal quotation omitted). "The construction and legal effect given a contract provision governing the award of attorneys' fees is a question of law, which we review under the right/wrong standard." *Hawaiian Isles Enter., Inc. v. City and County of Honolulu,* 76 Hawai'i 487, 489, 879 P.2d 1070, 1072 (1994).

## B. *Discussion*

On cross-appeal, Romero maintains that she is entitled to attorneys' fees based on provisions contained in the Options entered on February 20, 1989 for the two apartments, which states:

> 11. *Attorney's Fees.* In the event of any controversy, claims or dispute between the parties hereto, arising out of or relating to this Agreement or the breach thereof, the prevailing party shall be entitled to recover from the losing party reasonable expenses, attorney's fees and costs.

Defendant, on the other hand, insists that the trial court denied Romero's request for fees because Romero "never brought an action on the contract ... for any alleged failure on the part of Defendant to perform or to comply with the provisions of the [Options]." Instead, Romero claimed that the Options are void because they were fraudulently obtained. We agree with Defendant.

 " 'Ordinarily, attorneys' fees cannot be awarded as damages or costs unless so provided by statute, stipulation, or agreement.' " *Weinberg,* 78 Hawai'i at 53, 890 P.2d at 290 (quoting *S. Utsunomiya Enter., Inc. v. Moomuku Country Club,* 76 Hawai'i 396, 399 n. 3, 879 P.2d 501, 504 n. 3 (1994)). If the nature of the claim is "outside the terms of the provision providing for attorneys' fees[,]" then the fee provision does not apply, and attorneys' fees are not authorized. *Hawaiian Isles, supra,* (citing *Azer v. Myers,* 71 Haw. 506, 513, 795 P.2d 853, 857 (1990)).

 Romero alleged in her complaint, *inter alia,* that she relied on Defendant's expertise in real estate when she purchased the condominium units. Defendant, then, fraudulently induced her to agree to the Options by not revealing that Parenti and Defendant are the same person. Part of her claim for relief is for the trial court to declare that the Options be declared null and void. The attorneys' fees provision contained in the Options states: "In the event of any controversy, claims or dispute between the parties hereto, arising out of or relating to this Agreement or the breach thereof, the prevailing party shall be entitled to recover from the losing party reasonable expenses, attorney's fee and costs." Clearly, Romero's claim falls outside the terms of the fee provisions contained in the Options. Romero's claim does not involve a dispute "arising out of or relating to [the Options] or the breach thereof." Instead, she challenges the validity of the Options based on fraud and sought to prevent their enforcement. Consequently, we hold that the trial court did not err in denying Romero's motion for attorneys' fees on the basis that the claim is one in tort because her claim falls outside the terms of the agreement authorizing an award of attorneys' fees.

 Moreover, assuming *arguendo,* that the Options allow an award of attorneys' fees, we also find the trial court's alternative basis for denying the motion to be correct. Romero alleges that the trial court erred in denying her request for fees based "on the belief that punitive damages can be used to pay attorneys['] fees." The trial court relied upon footnote 2 of *Masaki, supra,* as an alternative basis of its denial of Romero's

request for attorneys' fees. The footnote reads:

> Other purposes for imposing punitive damages which have been recognized by courts and commentators include preserving the peace; inducing private law enforcement; compensating victims for otherwise uncompensable losses; and *paying the plaintiff's attorneys' fees.* Ellis, *Fairness and Efficiency in the Law of Punitive Damages,* 56 S.Cal.L.Rev. 1, 3 (1982).

*Masaki,* 71 Haw. at 8 n. 2, 780 P.2d at 572 n. 2 (emphasis added). Romero maintains that this footnote does not authorize denial of attorneys' fees when the party asking for fees has received an award of punitive damages. Such a result, according to Romero, is contrary to the acknowledged purpose of punitive damages in this jurisdiction of punishment and deterrence. We disagree.

There is nothing in the Hawai'i Supreme Court's discussion in *Masaki* to suggest that using punitive damages to pay for attorneys' fees will contravene an exemplary award's purpose of punishment and deterrence. *Masaki* identified these two purposes to be the ones clearly found in Hawai'i case law. *Id.* at 12, 780 P.2d at 573 (indicating that the cases in Hawai'i "clearly reflect the dual purposes of punitive damages as punishing the defendant for aggravated misconduct and deterring the defendant and others from engaging in like conduct in the future"). However, this does not mean that an award of punitive damages is limited to only two purposes. As delineated in footnote 2 of *Masaki,* punitive damages are imposed for other reasons, including payment of attorneys' fees. *See* 22 Am.Jur.2d *Damages* § 808 (1988). We hold that the trial court did not abuse its discretion when it denied Romero's motion for attorneys' fees on the basis that she had already received an award of punitive damages.

Accordingly, we affirm the trial court's denial of Romero's motion for attorneys' fees.

## III. CONCLUSION

For the foregoing reasons, we affirm the October 29, 1992 Judgment and the October 29, 1992 Order Granting in Part and Denying in Part Plaintiff's Motion for Attorney's Fees and Costs.