990 P.2d 713

TSA INTERNATIONAL LIMITED, a Hawai'i corporation, TSA Wailea Beach Palace, Inc., a Hawai'i corporation, TSWB, Inc., a Hawai'i corporation, TSA America Investments, Inc., a Delaware corporation, TSA Holding Company, Ltd., a Hawai'i corporation, TSA Waikapu, Inc., a Hawai'i corporation, Plaintiffs–Appellants,

v.

SHIMIZU CORPORATION, a Japan corporation, S.C. Properties (Hawaii), Inc., a Hawai'i corporation, SC Wailea Alanui, Inc., a Hawai'i corporation, SCP (Maui 1), Inc., a Hawai'i corporation, SCP (Maui 2), Inc., a Hawai'i corporation, SCP (Maui 5), Inc., a Hawai'i corporation, The Fukuoka City Bank, Ltd., a Japan corporation, Fukuoka Jisho Co., Ltd., a Japan corporation, H.F.J. Mauka, Inc., a Hawai'i corporation, Quarters, Inc., Maui Development Co., Ltd., K.L. America, Inc., S.C.-U.S., Inc., Shimizu International Finance (U.S.A.), Inc., Defendants–Appellees,

and

WGR, Inc., a Hawai'i corporation, Does 6 Through 50, inclusive, Defendants.

and

TSA International Limited, a Hawai'i corporation, TSA Wailea Beach Palace, Inc., a Hawai'i corporation, TSWB, Inc., a Hawai'i corporation, TSA America Investments, Inc., a Delaware corporation, TSA Holding Company, Ltd., a Hawai'i corporation, TSA Waikapu, Inc., a Hawai'i corporation, Plaintiffs–Appellants,

v.

Shimizu Corporation, a Japan corporation, S.C. Properties (Hawaii), Inc., a Hawai'i corporation, SC Wailea Alanui, Inc., a Hawai'i corporation, SCP (Maui 1), Inc., a Hawai'i corporation, SCP (Maui 2), Inc., a Hawai'i corporation, SCP (Maui 5), Inc., a Hawai'i corporation, S.C.-U.S., Inc., Shimizu International Finance (U.S.A.), Inc., Defendants–Appellees,

and

The Fukuoka City Bank, Ltd., a Japan corporation, Fukuoka Jisho Co., Ltd., a Japan corporation, WGR, Inc., a Hawai'i corporation, H.F.J. Mauka, Inc., a Hawai'i corporation, Quarters, Inc., Maui Development Co., Ltd., K.L. America, Inc., Does 6 Through 50, inclusive, Defendants.

Nos. 21431, 21726.

Supreme Court of Hawai'i.

Nov. 8, 1999.

As Amended on Denial of Reconsideration Dec. 30, 1999.

Thomas E. Bush, (William C. McCorriston, Franklin K. Mukai, and Daniel J. Kunkel with him on the brief), of McCorriston, Miho, Miller, Mukai, on the briefs, Honolulu, for plaintiffs-appellants.

Roy J. Tjioe (David J. Dezzani and Margaret Jenkins Leong with him on the brief), of Goodsill, Anderson, Quinn & Stiffel, on the briefs, Honolulu, for defendants-appellees.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by RAMIL, J.

These appeals arise from the dissolution of a partnership formed to develop the Four Seasons Resort in Wailea, Maui. After dissolution of the partnership, plaintiffs-appellants TSA International Limited, et al. (TSA)[1] brought an action against defendants-appellees Shimizu Corporation, et al. (Shimizu)[2] alleging, *inter alia*, fraud, breach of fiduciary duty, fraudulent transfer, and violation of the Racketeer Influenced and Corrupt Organizations Act (RICO). The circuit court granted Shimizu's motions for summary judgment as to all claims brought by TSA and entered judgment in favor of Shimizu.

On appeal, TSA asserts a plethora of issues. In No. 21431, TSA contends, *inter alia*, that the circuit court erred in: (1) denying their motion to disqualify the trial judge; (2) granting Shimizu's motion for taxation of attorneys' fees and costs; and (3) granting Shimizu's motions for summary judgment with respect to the claims for: (a) fraud; (b) breach of fiduciary duty; (c) fraudulent transfers pursuant to HRS ch. 651C (1993); and (d) RICO violations under Section 1962 of Title 18 of the United States Code (U.S.C.) (1994). In No. 21726, TSA contends that the

circuit court erred in granting Shimizu's motion to expunge the *lis pendens* after the notice of appeal was filed in No. 21431. For the reasons discussed below, we vacate the circuit court's judgment with respect to the issue of Shimizu's attorneys' fees, but affirm the circuit court's judgment in all other respects.

## I. BACKGROUND

### A. Facts

In 1986, Takeshi Sekiguchi, president of TSA, approached Shimizu Corporation, a large construction corporation, with plans for developing the Four Seasons Resort ("the Hotel"). Sekiguchi, a Japanese citizen, proposed that TSA could assist Shimizu in conducting the Four Seasons Project without taking substantial financial or business risks.

As a result of the negotiations, Shimizu and TSA formed a partnership—the Wailea Beach Palace Company (WBPC)—in 1987 to develop the Hotel. Through subsidiary corporations, TSA and Shimizu each invested $22 million in WBPC. The parties then secured a $180 million construction loan from The Fukuoka City Bank and K.L. America, Inc. (collectively, the "Fukuoka lenders"). According to Shimizu, TSA was made the managing general partner of WBPC and received a management fee of more than $200,000 annually from the partnership. As managing general partner, TSA had complete access to the partnership's records.

The parties later agreed to develop the Waikapu Golf Course ("the Golf Course") in Waikapū, Maui. The Waikapu Golf Course Properties ("the Golf Course Properties") consisted of two golf courses, residential lots, a quarry, and a tile factory. The Golf Course Properties were owned by Waikapu Mauka Partners (WMP). Before the agreement between TSA and Shimizu to develop the Golf Course Properties was entered into,

---

1. These appeals were filed by TSA International Limited and its subsidiaries, TSA Wailea Beach Palace, Inc., TSWB, Inc., TSA America Investments, Inc., TSA Delaware Holding Corporation, and TSA Waikapu, Inc. (collectively, TSA). By order dated December 17, 1998, this court consolidated Nos. 21431 and 21726.

2. The underlying lawsuit named as defendants Shimizu Corporation and its subsidiaries, S.C. Properties (Hawai'i), Inc., SC Wailea Alanui, Inc., SCP (Maui 1), Inc., SCP (Maui 2), Inc., SCP (Maui 5), Inc., S.C.-U.S., Inc., and Shimizu International Finance (U.S.A.), Inc.) (collectively, Shimizu).

WMP was seventy-percent (70%) owned by a Shimizu entity and thirty-percent (30%) owned by THP Associates ("THP"). To develop the Golf Course Properties, Shimizu invested $140 million by way of a loan to WMP. Although none of the TSA entities invested any capital in WMP, TSA was made a general partner in THP, holding a thirty-three and one-third percent interest.

As a result of poor economic conditions in the early 1990s, the Hotel and Golf Course loans became delinquent. In 1993, representatives of TSA, Shimizu, and the Fukuoka lenders met to negotiate the Hotel and Golf Course loans.[3] On or about August 28, 1993, the representatives executed the "work out" documents regarding a "work out" of the Hotel and Golf Course loans ("the Basic Agreement"). According to TSA, these documents were drafted in Japanese at the request of Shimizu.

As a result of their negotiations, the parties agreed that the Fukuoka lenders would be responsible for $65 million to settle the loans and purchase the golf courses. Specifically, the Fukuoka lenders allocated $40 million of its $65 million commitment to settle the Hotel loan. The parties also agreed that the delinquent $180 million Hotel loan would be resolved as follows: (1) the Fukuoka lenders would forgive $40 million of the debt; (2) Shimizu would make a capital contribution to WBPC of about $40 million; and (3) Shimizu would purchase the Hotel from WBPC for an additional $100 million. WBPC would then pay the $140 million received from Shimizu to the Fukuoka lenders, thereby satisfying the remaining balance of the $180 million Hotel loan. Both TSA and Shimizu waived their initial $22 million investments in the Hotel partnership, WBPC.

To dispose of the $140 million Golf Course loan, the parties agreed that the golf courses would be sold by WMP to an entity related to the Fukuoka lenders. As a result of the Fukuoka lenders' commitment of $65 million to work out the problem loans, the Golf Course purchase price was set at $25 million, which represents the difference between the Fukuoka lenders' $65 million commitment and the $40 million allocated to work out the Hotel loan. In effect, the $25 million purchase price for the Golf Course was set to confer a benefit of $115 million on the Fukuoka lenders. In exchange, the Fukuoka lenders would forgive the $140 million Golf Course loan. Because Shimizu had initially loaned $140 million to WMP to develop the Golf Course Properties, WMP would in turn forward the $25 million received from the Fukuoka lenders' purchase of the Golf Course Properties to Shimizu. Shimizu would take a loss of the remaining $115 million, which represents the difference between the initial $140 million loan for the Golf Course and the purchase price of $25 million.

During the course of final negotiations for the Basic Agreement, TSA requested and received a one-year option to purchase the Hotel back from Shimizu for "US $140 Million + acquisition costs such as taxes and other public charges, etc. + operating loss + interest." The parties set the option price to allow TSA to buy the Hotel back from Shimizu at the same amount paid by Shimizu to resolve the Hotel loans (*i.e.*, $140 million). The option price would thus allow Shimizu to be reimbursed and avoid any further losses on the Hotel project.

## B. *Procedural History*

### 1. *The Complaint*

On October 21, 1994, shortly before their option to purchase the Hotel was to expire, TSA filed their initial complaint. This complaint asserted claims for reformation and rescission based on fraud (Counts 1 and 2), breach of fiduciary duty (Count 3), and monetary damages based on fraud (Count 4). After filing a first amended complaint to correct the caption, TSA filed a second amended complaint on April 27, 1995 to add claims for violations of the securities laws (Count 5) and reformation/rescission due to mistake (Count 6). On November 9, 1995, TSA filed a third amended complaint that included facts relating to the value of the Hotel.

---

**3.** During these negotiations, the parties were represented by Sekiguchi for TSA, Yoshio Fujiwara for Shimizu, and Kazuhiko Enomoto for the Fukuoka lenders.

According to TSA, Shimizu's motivation to conclude the Basic Agreement was to terminate its obligation to fund the Golf Course and to obtain substantial tax advantages. According to TSA, as of 1993, Shimizu's obligation to fund the Golf Course had become burdensome, and Shimizu desired to terminate this obligation. In addition, TSA alleged that Shimizu desired to terminate its involvement in WBPC and WMP so that Shimizu could complete the restructuring of its holdings in the United States. TSA further alleged that Shimizu desperately wanted to complete the restructuring of its United States holdings before the close of the fiscal year ending on March 31, 1994. By doing so, TSA claims that Shimizu was able to receive "hundreds of millions of dollars" of tax refunds and tax savings from the Japanese government for losses that would be realized on the restructuring. To obtain this advantage, Shimizu needed to liquidate its interests in WBPC and WMP. In turn, Shimizu needed the consent and cooperation of the TSA partners that made up WMP and WBPC. To obtain such consent and cooperation, Shimizu allegedly made numerous promises and representations to TSA.

According to TSA, Shimizu induced TSA to refrain from hiring its own accountants or legal counsel because of "the long-term relationship of trust between Shimizu and TSA." TSA further alleged that, although Shimizu hired an accountant to analyze the tax consequences of the Basic Agreement, Shimizu failed to share the complete tax analysis with TSA.

TSA further claimed that Shimizu represented that TSA would gain significant tax benefits if TSA agreed to the Basic Agreement. In addition, TSA alleged that it was duped by Shimizu into agreeing to the option to purchase the Hotel. Although the option purchase price was set at $140 million, TSA later found that Shimizu's appraisal of the Hotel ranged from $62.6 million (Shimizu's appraisal) to $64 million (Shimizu's accountant's appraisal). As a result of Shimizu's failure to disclose these appraisals, TSA relied on Shimizu's alleged representation that $140 million was the actual value of the Hotel and therefore the appropriate option price.

TSA claimed that it would not have agreed to the Basic Agreement had it been aware of the appraisals of the Hotel.

Finally, TSA also claimed that it was duped by Shimizu into agreeing to the $25 million purchase price for the Golf Course. According to TSA, Shimizu structured the sale of the Golf Course "to obtain unwarranted tax benefits for itself ... without regard to the adverse effects on its TSA partners." TSA alleges that Shimizu negotiated the sale of the Golf Course for the price of $25 million even though Shimizu knew that the Golf Course was actually worth $45 million. TSA claimed that the sale of the Golf Course for the $25 million bargain price was to create a fictitious loss of $20 million for Shimizu and resulted in WBPC realizing $20 million of cancellation of debt income that WBPC should never have realized.

According to TSA, Shimizu was able to allocate the $20 million of additional income to the TSA partners of WBPC by selectively applying the Amendment of Limited Partnership Agreement of WBPC (the Amendment) that was executed on August 28, 1993. Under the terms of the Amendment, 99.999% of WBPC's income and loss belonged to the Shimizu partners. TSA claims that Shimizu instructed WBPC's accountants to prepare WBPC's final federal and State of Hawai'i income tax returns so that WBPC's cancellation of debt income, approximately $84 million, was allocated equally between the Shimizu and TSA partners in contravention of the partnership agreement. At the same time, Shimizu instructed WBPC's accountants to allocate 99.999% of the loss on the sale of the Hotel, approximately $28 million, to the Shimizu partners. According to TSA, as a result of the alleged "inconsistent and improper allocation of WBPC income and loss," Shimizu obtained a tax benefit of approximately $16 million at the expense of TSA.

2. *The First Motion for Summary Judgment*

On November 26, 1996, Shimizu filed a motion for summary judgment seeking dismissal of Counts 1, 2, and 6 of TSA's third amended complaint. On December 16, 1996,

the circuit court granted Shimizu's first motion for summary judgment.

### 3. The Second Motion for Summary Judgment

On January 28, 1997, Shimizu filed its second motion for summary judgment seeking dismissal of TSA's fraud and breach of fiduciary duty claims (Counts 3, 4, and 5). On February 27, 1997, the circuit court granted Shimizu's motion with respect to the alleged fraud and securities law violations, but denied the motion with respect to TSA's breach of fiduciary duty claim. On March 19, 1997, TSA filed a motion for reconsideration with respect to the circuit court's order granting Shimizu's second motion for summary judgment. In its motion for reconsideration, TSA alleged "new" evidence supporting its fraud claim. Finding that TSA's alleged "new" evidence did not contain any information not previously known, the circuit court denied TSA's motion for reconsideration.

### 4. The Motion to Recuse the Trial Judge

With trial scheduled to commence before Judge Boyd P. Mossman on June 23, 1997, TSA moved to disqualify Judge Mossman on June 10, 1997. TSA alleged in its motion that improper *ex parte* communication had occurred between Judge Mossman and Thomas Monson, a former officer of TSA. During December 1994 or January 1995, Monson allegedly placed a telephone call to Judge Mossman regarding an alleged $60,000 check that was written to the Waikapu Golf Course in the fall of 1994. Subsequently, Monson left the employ of TSA on January 31, 1995. Monson was an acquaintance of Judge Mossman and both attended the same church. When TSA brought this matter to Judge Mossman's attention during a May 28, 1997 status conference, Judge Mossman stated that his "opinion of Tom Monson was that he's a very honest person" and that "it didn't surprise [him] that if he felt that somebody was doing wrong or dishonest that he would leave." The motion for recusal was referred to Judge E. John McConnell. After a hearing on July 8, 1997, Judge McConnell denied the motion.

### 5. The Third Motion for Summary Judgment

On May 5, 1997, Shimizu filed its third motion for summary judgment with respect to TSA's breach of fiduciary duties claim. Because of TSA's motion to recuse Judge Mossman, the hearing on this motion was postponed to December 16, 1997. The circuit court later granted Shimizu's third motion for summary judgment.

### 6. Shimizu's Fourth Motion for Summary Judgment

On September 26, 1997, TSA filed a motion for leave to file a Fourth Amended Complaint alleging (1) fraudulent transfer (Count 7), (2) unfair and deceptive trade practices (Count 8), and (3) RICO violations (Count 9). After the circuit court granted TSA's motion to amend the complaint, TSA filed its fourth amended complaint. On November 26, 1997, Shimizu filed a fourth motion for summary judgment on these new claims. On December 16, 1997, the circuit court granted Shimizu's fourth motion for summary judgment.

### 7. Attorney's Fees and Costs

On January 16, 1998, Shimizu moved for an award of attorneys' fees and costs. Pursuant to the circuit court's request, Shimizu submitted information regarding the hourly rates of its attorneys and legal assistants, descriptions of the tasks performed, the billed time, the billed charges, and copies of invoices. These documents were delivered to the court under seal to protect work product and attorney-client information. Thereafter, the circuit court awarded Shimizu $1,827,005.67 in attorneys' fees and $130,549.30 in taxable costs.

On March 11, 1998, the circuit court entered judgment in favor of Shimizu and against TSA. On March 16, 1998, TSA filed a timely notice of appeal in No. 21431.

### 8. Shimizu's Motion to Expunge Lis Pendens

During the ongoing litigation, on November 3, 1994, TSA filed a notice of *lis pendens*. In support, TSA asserted in relevant part:

This action involves a demand for reformation of agreement and enforcement of the reformed agreement to allow Plaintiff TSA International Limited to purchase the Four Seasons Resort, or for rescission of agreement to return ownership of the Four Seasons Resort to a limited partnership in which Plaintiffs TSA Wailea Beach Palace, Inc. and TSWB, Inc. have an interest.

Reformation of agreement or rescission of agreement will affect the title to or right to possession of, said real property and the rights of any persons claiming or having an interest therein.

On November 4, 1994, TSA recorded the *lis pendens* with the Land Court.

On May 1, 1998, Shimizu filed a motion to strike and expunge TSA's notice of *lis pendens*. After a hearing, the circuit court entered an order granting Shimizu's motion to expunge the *lis pendens*. From this order, TSA filed a timely notice of appeal in No. 21726.

## II. *STANDARDS OF REVIEW*

### A. *Motion to Disqualify Judge*

With regard to motions to disqualify or recuse a judge, we have recently stated:

Decisions relating to the conduct of a trial or hearing and the adequacy of process usually involve the exercise of discretion, and thus warrant review under the abuse of discretion standard on appeal. *See, e.g., Kawamata Farms, Inc. v. United Agri Products*, 86 Hawai'i 214, 245, 948 P.2d 1055, 1086 (1997) (trial court's ruling on a motion for mistrial reviewed under abuse of discretion standard). Decisions on recusal or disqualification present perhaps the ultimate test of judicial discretion and should thus lie undisturbed absent a showing of abuse of that discretion. As one court stated:

[T]he jurist requested to recuse himself is the most capable to determine those factors hidden in the recesses of the mind and soul which would bear upon his or her capability to maintain the impartiality that each matter must receive.... The decision of that judge is final, subject to review only for an abuse of that discretion.

*Goodheart v. Casey*, 523 Pa. 188, 565 A.2d 757, 763 (Pa.1989) (citation omitted). *See also United States v. Rogers*, 119 F.3d 1377, 1380 (9th Cir.1997) ("We review the denial of a motion for disqualification for abuse of discretion."); *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir.1992) ("Since recusal motions are committed to the sound discretion of the district court, ... the issue on appeal is whether the court abused its discretion."); *Gulf Maritime Warehouse Co. v. Towers*, 858 S.W.2d 556, 558 (Tex.App.1993) ("A judge's refusal to recuse is viewed on appeal by an abuse of discretion standard."). We accordingly adopt the abuse of discretion standard for reviewing a judge's denial of a motion for recusal or disqualification.

*State v. Ross*, 89 Hawai'i 371, 375–76, 974 P.2d 11, 15–16 (1998).

### B. *Summary Judgment*

We review [a] circuit court's award of summary judgment de novo under the same standard applied by the circuit court. *Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 104, 839 P.2d 10, 22, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992) (citation omitted). As we have often articulated:

[s]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Id.* (citations and internal quotation marks omitted); *see* Hawai'i Rules of Civil Procedure (HRCP) Rule 56(c) (1990). "A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Hulsman v. Hemmeter Dev. Corp.*, 65 Haw. 58, 61, 647 P.2d 713, 716 (1982) (citations omitted).

*Konno v. County of Hawai'i*, 85 Hawai'i 61, 70, 937 P.2d 397, 406 (1997) (quoting *Dunlea*

*v. Dappen,* 83 Hawai'i 28, 36, 924 P.2d 196, 204 (1996)) (brackets in original). In addition,

"[t]he evidence must be viewed in the light most favorable to the non-moving party." *State ex rel. Bronster v. Yoshina,* 84 Hawai'i 179, 186, 932 P.2d 316, 323 (1997) (citing *Maguire v. Hilton Hotels Corp.,* 79 Hawai'i 110, 112, 899 P.2d 393, 395 (1995)). In other words, "we must view all of the evidence and the inferences drawn therefrom in the light most favorable to [the party opposing the motion]." *Maguire,* 79 Hawai'i at 112, 899 P.2d at 395 (citation omitted).

*State Farm Mut. Auto Ins. Co. v. Murata,* 88 Hawai'i 284, 287–88, 965 P.2d 1284, 1287–88 (1998) (quoting *Estate of Doe v. Paul Revere Ins. Group,* 86 Hawai'i 262, 269–70, 948 P.2d 1103, 1110–11 (1997)) (some brackets in original and some added).

## C. *Attorneys' Fees and Costs*

This court reviews the circuit court's denial and granting of attorney's fees under the abuse of discretion standard. *Eastman v. McGowan,* 86 Hawai'i 21, 27, 946 P.2d 1317, 1323 (1997) (citation omitted); *Coll v. McCarthy,* 72 Haw. 20, 28, 804 P.2d 881, 887 (1991). "The trial court abuses its discretion if it bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Lepere v. United Public Workers,* 77 Hawai'i 471, 473, 887 P.2d 1029, 1031 (1995) (citation, internal quotation marks, and brackets omitted). Stated differently, "[a]n abuse of discretion occurs where the trial court has clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant." *State ex rel. Bronster v. United States Steel Corp.,* 82 Hawai'i 32, 54, 919 P.2d 294, 316 (1996). *Canalez v. Bob's Appliance Serv. Ctr., Inc.,* 89 Hawai'i 292, 299–300, 972 P.2d 295, 302–03 (1999); *see also, e.g., Piedvache v. Knabusch,* 88 Hawai'i 115, 118, 962 P.2d 374, 377 (1998).

## D. *Motion to Expunge Lis Pendens*

Whether a *lis pendens* should be expunged is a question to be resolved in the exercise of the trial court's discretion; accordingly, the trial court's decision is reviewed for an abuse of that discretion. *See Harada v. Ellis,* 4 Haw.App. 439, 444–45, 667 P.2d 834, 838–39 (1983); *Greenberg v. Superior Court,* 131 Cal.App.3d 441, 182 Cal.Rptr. 466 (1982).

*S. Utsunomiya Enters., Inc. v. Moomuku Country Club,* 75 Haw. 480, 504, 866 P.2d 951, 963–64, *reconsideration denied,* 76 Hawai'i 396, 879 P.2d 501 (1994).

## III. *DISCUSSION*

### A. *Motion to Disqualify Judge*

TSA argues that the circuit court erred in refusing to disqualify the trial judge. We disagree.

#### 1. *Personal Bias/Conflict of Interest*

HRS § 601–7 (1993) governs the disqualification of judges in this state. HRS § 601–7 provides:

**Disqualification of judge; relationship, pecuniary interest, previous judgment, bias or prejudice.** (a) No person shall sit as a judge in any case in which the judge's relative by affinity or consanguinity within the third degree is counsel, or interested either as a plaintiff or defendant, or in the issue of which the judge has, either directly or through such relative, any pecuniary interest; nor shall any person sit as a judge in any case in which the judge has been of counsel or on an appeal from any decision or judgment rendered by the judge.

(b) Whenever a party to any suit, action, or proceeding, civil or criminal, makes and files an affidavit that the judge before whom the action or proceeding is to be tried or heard has a personal bias or prejudice either against the party or in favor of any opposite party to the suit, the judge shall be disqualified from proceeding therein. Every such affidavit shall state the facts and the reasons for the belief that bias or prejudice exists and shall be filed before the trial or hearing of the action or proceeding, or good cause shall be shown for the failure to file it within such time. No party shall be entitled in any case to file more than one affidavit; and no affida-

vit shall be filed unless accompanied by a certificate of counsel of record that the affidavit is made in good faith. Any judge may disqualify oneself by filing with the clerk of the court of which the judge is a judge a certificate that the judge deems oneself unable for any reason to preside with absolute impartiality in the pending suit or action.

To disqualify a judge based on HRS § 601–7, the movant must timely file an affidavit "stat[ing] the facts and reasons for the belief that bias or prejudice exists." *Ross*, 89 Hawai'i at 377, 974 P.2d at 17 (quoting HRS § 601–7(b)). Specifically,

> "[t]he reasons and facts for the belief the [affiant] entertains . . . must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." *Whittemore v. Farrington*, 41 Haw. 52, 57 (1955) (citation omitted). The test assumes the viewpoint of a reasonable onlooker, rather than the subjective belief of the judge. *See Yorita v. Okumoto*, 3 Haw.App. 148, 153, 643 P.2d 820, 825 (1982).

*Ross*, 89 Hawai'i at 377, 974 P.2d at 17 (brackets added).

■ In this case, the alleged improper *ex parte* communication giving rise to the motion to disqualify the trial judge was an alleged brief telephone conversation between Judge Mossman and Monson, a former officer of TSA. The portion of the conversation challenged by TSA lasted two to three minutes and pertained to the Grand Hyatt Hotel, a property unrelated to the agreements to resolve the loans in this case. In addition, Monson was not a party to the litigation or a witness to any of the events at issue. Although Judge Mossman may have known that the Grand Hyatt was owned by a Japanese entity, he did not know whether it was owned by either Shimizu or TSA at the time of the conversation. Given these facts, we hold that Judge McConnell did not abuse his discretion in finding, under HRS § 601–7, that Judge Mossman did not have a personal bias in deciding the case.

2. *Appearance of Impropriety*

Apart from any questions of personal bias or conflict of interest, TSA argues that Judge Mossman's alleged improper *ex parte* communication with Monson created an appearance of impropriety. With regard to the disqualification of a judge on the basis of an appearance of impropriety, the Code of Judicial Conduct (Revised) (1992) (CJC) offers additional guidelines for the conduct of judges. Canon 2 of the CJC sets forth the broad mandate that "a judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities." Speaking directly to disqualification, Canon 3(E) states in pertinent part:

> **DISQUALIFICATION.** (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
>
> (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]

On the other hand,

> a judge owes a duty not to withdraw from a case—however much his personal feelings may incline him to do so—where the circumstances do not fairly give rise to an appearance of impropriety and do not reasonably cast suspicion on his impartiality.

*Ross*, 89 Hawai'i at 380, 974 P.2d at 20 (quoting *State v. Brown*, 70 Haw. 459, 467 n. 3, 776 P.2d 1182, 1188 n. 3 (1989)). As we observed in *Ross*,

> "bad appearances alone do not require disqualification. Reality controls over uninformed perception." *Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363, 1372 (7th Cir.1994). The integrity of the judicial process depends on "justice . . . satisfy[ing] the appearance of justice." *Brown*, 70 Haw. at 467, 776 P.2d at 1188. Our judicial system, however, also rests on the premise that "the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813,

820, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986) (quoting 3 W. Blackstone, Commentaries 361). While the principle that "justice must satisfy the appearance of justice" exhorts judges to "hold the balance nice, clear and true," *[i]d.* at 822 [106 S.Ct. 1580] (citation omitted), it does not invite any party concerned about or dissatisfied with the outcome of a case to seek a different judge.

*Ross,* 89 Hawai'i at 380–81, 974 P.2d at 20–21 (brackets omitted).

Based upon these principles, we have recently held that "the test for disqualification due to the 'appearance of impropriety' is an objective one, based not on the beliefs of the petitioner or the judge, but on the assessment of a reasonable impartial onlooker apprised of all the facts" as to "whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired." *Id.* at 380, 974 P.2d at 20.

■ In this case, Monson, with whom Judge Mossman had an allegedly improper *ex parte* communication, was neither a party to the case nor a witness to any of the events at issue. Although the alleged improper communication concerned the Grand Hyatt Hotel, a property not in issue in this case, Judge Mossman did not know that it was owned by either TSA or Shimizu. Neither TSA nor Sekiguchi was mentioned during the conversation. Given these circumstances, we hold that a reasonable observer would not find that Judge Mossman's acquaintance and communication with Monson created an "appearance of impropriety" requiring his disqualification. Therefore, the circuit court did not abuse its discretion in denying TSA's motion for disqualification based on the appearance of impropriety.

### B. *Fraud*

TSA contends that the circuit court erred in concluding that there were no genuine issues of material fact with respect to its fraud claim. TSA maintains that: (1) it was fraudulently induced into agreeing to the Basic Agreement by Shimizu's alleged representation that TSA would receive a $22 mil-

lion tax benefit from the Basic Agreement; and (2) it was fraudulently induced into agreeing to the $140 million option price for the Hotel. We disagree.

■ To constitute fraudulent inducement, a party must establish the following elements:

(1) false representations were made by defendants, (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and (4) plaintiff did rely upon them.

*Hawaii's Thousand Friends v. Anderson,* 70 Haw. 276, 286, 768 P.2d 1293, 1301 (1989) (hereafter *"Anderson"*) (citing *Kang v. Harrington,* 59 Haw. 652, 656, 587 P.2d 285, 289 (1978)); *see also Pancakes of Hawaii, Inc. v. Pomare Properties Corp.,* 85 Hawai'i 300, 312, 944 P.2d 97, 109 (App.1997) (quoting *Honolulu Fed. Sav. & Loan Ass'n v. Murphy,* 7 Haw.App. 196, 201–02, 753 P.2d 807, 811–12 (1988)). The party claiming fraud must establish these elements by clear and convincing evidence. *Anderson,* 70 Haw. at 286, 768 P.2d at 1301 (citing *Dobison v. Bank of Hawaii,* 60 Haw. 225, 226, 587 P.2d 1234, 1235 (1978)).

■ To be actionable, the alleged false representation must relate to a past or existing *material* fact and not the occurrence of a future event. *Stahl v. Balsara,* 60 Haw. 144, 149, 587 P.2d 1210, 1214 (1978) (emphasis added). As this court has previously observed:

[F]raud cannot be predicated on statements which are promissory in their nature, or constitute expressions of intention, and an actionable representation cannot consist of mere broken promises, unfulfilled predictions or expectations, or erroneous conjectures as to future events, even if there is no excuse for failure to keep the promise, and even though a party acted in reliance on such promise.

*Id.* (citations omitted). Indeed, as this court has long stated:

Fraud is never presumed. Where relief is sought on account of fraudulent representations, the facts sustaining the charge

should be clearly and satisfactorily established. . . . Where misrepresentations are made to form the basis of relief, they must be shown to have been made with respect to a material fact *which was actually false*[.]

*Id.* at 148, 587 P.2d at 1213 (quoting *Peine v. Murphy*, 46 Haw. 233, 238, 377 P.2d 708, 712 (1962)) (citations omitted) (emphasis added).

### 1. *Shimizu's Alleged Promise of a Tax Benefit*

TSA argues that Shimizu promised TSA an "overall $22 million tax benefit." In support, TSA cites to Sekiguchi's testimony in the record. After being asked, "So what did you say Mr. Fujiwara promised that TSA didn't get in relation to a tax benefit," Sekiguchi testified that "[i]t was to be arranged so that TSA will be able to realize a tax benefit of $22 million from those two transactions." In another portion of the record, Sekiguchi testified that the $22 million tax benefit would result "from the resolving of the two partnerships."

In response, Shimizu contends that TSA actually realized a $22 million tax benefit in 1993 (*i.e.*, that its representation was true). Shimizu notes that TSA declared a $22 million loss on its tax returns for 1993. Specifically, TSA America, a TSA subsidiary that purportedly loaned $22 million to WBPC, reported a tax loss of $29 million based on TSA's investment of $22 million in the partnership plus accrued interest.

■ Although TSA claims that Shimizu's alleged representation is shown to be false by the fact that TSA's tax returns reported an $18 million gain as a result of cancellation of debt income (CODI) arising from the transactions, this does not change the fact that TSA realized a total loss of $29 million as a result of the agreement. Indeed, the Basic Agreement does not purport to address whether any party would or would not receive CODI. The Basic Agreement simply addresses the allocation of the total losses from the hotel project to TSA. Given that TSA actually reported a $29 million loss, it failed to adduce any evidence—direct or circumstantial—that Shimizu's statement that TSA would receive a $22 million tax benefit

was made with knowledge of its falsity or without knowledge of its truth or falsity.

■ In addition, TSA could not have reasonably relied on Shimizu for proper advice about every possible tax consequence arising from the transaction, especially considering Sekiguchi's admission that Shimizu did not have any information regarding the finances of the eighty-two TSA entities comprising TSA's consolidated tax group. Instead, Shimizu's alleged representation concerned the $22 million loss out of the total $224 million loss stemming from the transaction that TSA actually realized. Therefore, even taking Sekiguchi's testimony as true, there was no genuine issue of material fact regarding the truth of the alleged representation by Fujiwara that a "tax benefit" would flow to TSA as a result of the Basic Agreement.

### 2. *Alleged Misrepresentation Regarding Actual Value of Hotel*

TSA also claims that Shimizu fraudulently represented that the option price of $140 million was the fair market value of the Hotel, even though appraisals showed the value to be far less. In support, TSA cites to Fujiwara's alleged representation to Sekiguchi that "$140 million was the actual value of the [Hotel]." TSA contends that if Sekiguchi had known that $140 million was not the actual value of the Hotel, he would not have agreed to the Option Memorandum.

In response, Shimizu contends that there was no evidence of Fujiwara's representation that $140 million was the fair market value of the Hotel. In fact, at his deposition, Sekiguchi conceded that Fujiwara did not use the term "fair market value." Sekiguchi could not recall whether the word "value" was used by Fujiwara in English or Japanese, but described the alleged representation as follows: "It was said that $140 million was an appropriate amount that was the actual value."

■ Moreover, the record indicates that the option price of $140 million was set at the amount necessary to restore to Shimizu the $140 million of new money it was paying to settle the Hotel loans and not the actual value of the Hotel at the time of the agree-

ment. Indeed, Sekiguchi himself confirmed during his deposition that the option price was set at the amount necessary to reimburse Shimizu for the $140 million of new capital used to resolve the Hotel loans, so that it would not sustain further losses if the option were exercised. Specifically, Sekiguchi testified: "The price should be in such a way that Shimizu would not come out with a deficit the following year. Because the term of the option is for a year, the amount should be the one that would not put Shimizu in the red at a year after when TSA would buy back." Enomoto, whom Sekiguchi described as "the mediator," also testified that the actual value of the Hotel was not an issue in determining the option price. Given that the option price was not set according to the fair market value of the Hotel, the fact allegedly misrepresented was immaterial to TSA's acquiescence in the Basic Agreement. Indeed, the record reflects that the motivation behind the Basic Agreement was to settle the delinquent loans and to prevent Shimizu from incurring further losses. Therefore, the circuit court correctly granted Shimizu's motion for summary judgment with respect to TSA's fraud claims.

## C. Breach of Fiduciary Duty—The Duty to Disclose

TSA next contends that the circuit court erred in granting Shimizu's second motion for summary judgment regarding TSA's claims of breach of fiduciary duties. TSA maintains that Shimizu owed a fiduciary duty to the WBPC partnership and that Shimizu breached that duty by failing to disclose certain tax and real estate appraisal information. We disagree.

### 1. The Existence of a Fiduciary Duty

 Although this court has never fully discussed the nature of the obligations owed by partners to the partnership to which they belong, HRS ch. 425 (1993) sets forth the basic principles of partnership law in this state. Part IV of HRS ch. 425 is based on

the Uniform Partnership Act (UPA), which has been adopted by nearly all states.[4] See generally HRS §§ 425–101 through 425–143. With regard to the nature of the duties owed by partners to the partnership, HRS § 425–121(1) (1993) provides:

**Partner accountable as a fiduciary.** (1) Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by the partner without the consent of the other partners from *any transaction connected with the* formation, conduct, or *liquidation* of the partnership or from any use by the partner of its property.

(Emphases added.) Based upon this language, every partner owes fiduciary duties to the partnership that he or she is a part of. Because the objective of the Basic Agreement in this case was to liquidate and dissolve the partnership formed by TSA and Shimizu, we hold that TSA and Shimizu owed fiduciary duties to the partnership in negotiating the terms of the dissolution of the partnership and the sale of the partnership properties.

### 2. The Duty of Disclosure in a Partnership Relationship

 Generally, the fiduciary relationship among partners imposes on them obligations of utmost good faith and integrity in their dealings with one another in partnership affairs. See HRS § 425–121(1); see also, e.g., Starr v. Fordham, 420 Mass. 178, 648 N.E.2d 1261 (Mass.1995); Leff v. Gunter, 33 Cal.3d 508, 189 Cal.Rptr. 377, 658 P.2d 740 (Cal.1983); Couri v. Couri, 95 Ill.2d 91, 69 Ill.Dec. 117, 447 N.E.2d 334 (1983). The duty to disclose is a hallmark of this fiduciary relationship and requires full disclosure in the context of one partner's acquisition of another's partnership interest and in the dissolution of partnership affairs. 2 Alan R. Bromberg & Larry E. Ribstein, *Bromberg & Ribstein on Partnership* § 6.06 at 6:90 (1996); see also, e.g., Gum v. Schaefer, 683

**4.** 59A Am.Jur.2d *Partnership* § 2 (1987) (noting that the UPA has been adopted by "all states but one") (footnote omitted); Regina M. Giannini, *"Punctilio of Honor" or "Disintegrating Erosion"? The Fiduciary Duty to Disclose for Part-* ners, Corporate Directors, and Majority Shareholders, 27 Sw. U.L.Rev. 73, 92 (1997) (noting that the UPA has been adopted by "forty-six states as well as the Virgin Islands and the District of Columbia") (footnote omitted).

S.W.2d 803 (Tex.Civ.App.1984) (fiduciary duty of disclosure exists in the purchase or sale of a partnership interest); *Steeby v. Fial,* 765 P.2d 1081, 1084 (Colo.App.1988) (partners had duty of disclosure in the "winding-up" phase of the partnership relationship).

We note that this fiduciary duty to disclose is separate and distinct from the duty of partners to respond to requests for information under HRS § 425-120 (1993), which provides:

> **Duty of partners to render information.** Partners shall render *on demand* true and full information of all things affecting the partnership to any partner or the legal representative of any deceased partner or partner under legal disability.

(Emphasis added.) Notwithstanding that HRS § 425-120 specifically requires that partners shall render true and full information *on demand,* HRS § 425-120 nevertheless does not abrogate a partner's broad fiduciary duty to disclose all material facts. *See, e.g., Appletree Square I Ltd. Partnership v. Investmark, Inc.,* 494 N.W.2d 889, 891 (Minn.App.1993) (noting that UPA provision creating duty of partners to respond to requests for information did not eliminate fiduciary duty to disclose material information to their partners); *see also* H. Reuschlein & W. Gregory, *Handbook on the Law of Agency and Partnership,* 285 (1979) (the duty to render information is not the same as the fiduciary duty to disclose). In contrast to HRS § 425-120, the fiduciary duty to disclose requires

> [g]eneral partners ... to disclose to their co-partners, in utmost candor, all facts and circumstances which are material to the partnership's business. The duty of disclosure requires partners not to misrepresent or intentionally conceal material facts, as well as affirmative, timely disclosure without prompting.

Robert C. Montgomery, *The Fiduciary Duties of General Partners,* 17 Colo. Law. 1959, 1962 (1988).

### 3. The Limits on the Duty to Disclose— Materiality

Notwithstanding the principles surrounding the duty of full disclosure, to constitute a breach of fiduciary duty, "it is essential that the misrepresentation or concealment should be ... in regard to a fact material to the contract." *Walter v. Holiday Inns, Inc.,* 985 F.2d 1232, 1238 (3d Cir.1992) (citation omitted). In other words, nondisclosure of information does not constitute a breach of fiduciary duty "unless the nondisclosed facts were such as might be expected to have induced action or forbearance by the other partners—that is, were material." 2 Bromberg & Ribstein, *supra,* § 6.06 at 6:64; *see also Diamond Parking, Inc. v. Frontier Bldg. Partnership,* 72 Wash.App. 314, 864 P.2d 954, 958 (1993), *review denied,* 124 Wash.2d 1028, 883 P.2d 327 (1994) (noting that limited partners alleging breach of fiduciary duty based on failure to disclose must show that general partners failed to disclose material information relevant to decision and that limited partners would have acted differently had all missing information been presented to them). This duty is based not only upon the expectation of mutual honesty among fiduciaries, but also on the economic policy concern that the party who controls the information or who may obtain it at a lower cost must disclose it so that the other party need not undertake a costly investigation. Giannini, *supra* note 3, 27 Sw. U.L.Rev. at 75 (footnote omitted).

The materiality of undisclosed information, however, "cannot be determined in a vacuum." *Walter,* 985 F.2d at 1239. In business transactions, the alleged undisclosed information must be evaluated in the context in which it was omitted. *Id.* An omitted fact is material if there is a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder[.]" *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

It appears to be universally accepted that the following factors are to be considered in determining whether a fiduciary duty has been breached by either a material mis-

statement or a failure to disclose a material fact: (1) the business sophistication of the complaining partner; (2) the degree of access to partnership records; and (3) the level of participation of the complaining partner in partnership affairs. *See, e.g., Walter,* 985 F.2d at 1239; *Burke v. Farrell,* 656 P.2d 1015, 1017 (Utah 1982) (although selling partner did not disclose value of partnership interest, there was no breach of fiduciary duty where acquiring partner had "ample access to information about the value of his partnership interest" and had "ready access to the records of the partnership"). As leading commentators in the law of partnerships have stated:

> The extent of the duty to disclose depends on the circumstances of the individual case ... [and] may depend on the degree to which the parties have access to accurate financial records, on whether the nondisclosing partner managed the business and thus was familiar with the relevant information, and on the knowledgeability or degree of expertise of the party to whom the duty of disclosure is owed.

Bromberg & Ribstein, § 6.06 at 6:64 (citation and footnote omitted) (brackets and ellipsis added); *see also id.* § 6:05 at 6:55 to 6:56 ("[I]f the partners have equal access to the books, and if full information is disclosed in them, they may be bound by interpartner transactions even without direct disclosure."); 59A Am.Jur.2d *Partnership, supra,* at 463 ("even ... blatant misconduct [by a partner] does not always constitute a violation of the duty sufficient to afford relief—especially where the alleged wrongdoer is not in a position of dominance, management, or control") (footnote omitted) (brackets added).

In *Walter,* the United States Court of Appeals for the Third Circuit held that the defendant did not omit material facts that it had a duty to disclose to plaintiffs. 985 F.2d at 1247–48. The plaintiffs in *Walter* formed a $^{50}\!/_{50}$ partnership with the defendant to develop a hotel/casino. *Id.* at 1234. Under the terms of the partnership agreement, the day-to-day operations were left to the defendant, but the more important management and financial decisions remained with the partnership's executive committee, which was comprised of two executives of the defendant and two of the plaintiffs. *Id.* at 1235. When the project began to experience financial difficulties, the partners were asked to contribute additional working capital to the project. *Id.* The plaintiffs determined not to supply their share of the funds requested, allegedly relying on the defendant's pessimistic predictions about the financial prospects of the project. *Id.* As a result, the defendant advanced its own funds to cover the shortfalls in exchange for the dilution of the plaintiffs' partnership interests. *Id.* Thereafter, relying on further reports of the financial situation of the project, the plaintiffs sold their remaining interest. *Id.*

Shortly after the buy-out, the project became a profitable enterprise. *Id.* at 1236. The plaintiffs thereafter filed suit against the defendant, alleging that the defendant had failed to provide them with information needed to negotiate the buy-out transaction from an equal bargaining position with the defendant. *Id.* Specifically, the plaintiffs pointed to seven specific instances of nondisclosure or misrepresentation by the defendant. *See id.* at 1242–47. At trial, after the plaintiffs rested their case-in-chief, the defendant moved for judgment as a matter of law on all claims.[5] *Id.* at 1236. The

---

5. TSA attempts to distinguish *Walter* from the instant case arguing that *Walter* did not involve a motion for summary judgment. As the Third Circuit observed, however, a motion for judgment as a matter of law was formerly known as a motion for directed verdict. *Walter,* 985 F.2d at 1238 (citation omitted). The Third Circuit also recognized that a motion for judgment as a matter of law

> should be granted only if, "viewing all the evidence which has been tendered and should have been admitted in the light most favorable to the party opposing the motion, no jury could

decide in that party's favor." *Indian Coffee Corp. v. Procter & Gamble Co.,* 752 F.2d 891, 894 (3d Cir.), *cert. denied,* 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 150 (1985).

Although judgment as a matter of law should be granted sparingly, "federal courts do not follow the rule that a scintilla of evidence is enough. The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party."

United States District Court for the District of New Jersey granted the defendant's motion, holding that, even assuming that a fiduciary duty existed and was breached, judgment as a matter of law for the defendant was appropriate because the plaintiffs failed to prove that the alleged misstatements and omissions would have been material to their decision to sell their partnership interest or that they would have relied on the non-disclosed information. *Id.*

On appeal, the Third Circuit began its analysis by noting the sophistication of plaintiffs and the unrestricted access to all information regarding the partnership and its financial operations. *Id.* at 1240–41. Turning to the financial projections that were allegedly undisclosed, the *Walter* court applied the following factors (hereafter "the *Flynn* factors") for evaluating materiality: the facts upon which the information is based; the qualifications of those who prepared or compiled it; the purpose for which the information was originally intended; its relevance to the stockholders' impending decision; the degree of subjectivity or bias reflected in its preparation; the degree to which the information is unique; and the availability to the investor of other more reliable sources of information.

*Id.* at 1242 (quoting *Flynn v. Bass Bros. Enters.,* 744 F.2d 978, 988 (3d Cir.1984). Applying these factors, the Third Circuit reasoned that the financial projections that were allegedly undisclosed were prepared for the internal use of the defendant's executive in negotiating the buy-out and were based on guesswork infused with personal hunches.

*Id.* at 1242–43. The Third Circuit further observed that the plaintiffs failed to show that they would have placed any greater reliance on the undisclosed projections than those previously disclosed or those prepared by their independent auditor. *Id.* at 1243. On this basis, the Third Circuit affirmed the district court. *Id.*

### 4. The Alleged Failure to Disclose

We note, as a preliminary matter, that the court's analysis in *Walter* is persuasive and sufficiently analogous to the situation in the instant case. We therefore apply the *Flynn* factors used by the *Walter* court in our analysis.

### a. The Real Estate Appraisal

In this case, the *Flynn* factors weigh against a finding of materiality of the alleged undisclosed appraisal. First, in light of the terms of the Basic Agreement and the discussions leading to the Basic Agreement, the appraisal of the Hotel was irrelevant to TSA's acquiescence in the Basic Agreement, inasmuch as the Basic Agreement was structured specifically to dispose of the $140 million Hotel loan. Because the Basic Agreement was not based on the fair market value of either the Golf Course Properties or the Hotel, the real estate appraisal would not have been a relevant concern in deciding whether to accept the terms of the Basic Agreement.

Indeed, the parties agreed that the Golf Course Properties would be sold to an entity related to the Fukuoka lenders. As a result of the Fukuoka lenders' commitment of $65 million to work out the problem loans, the

---

*Patzig v. O'Neil,* 577 F.2d 841, 846 (3d Cir. 1978) (citation omitted) (quotation omitted). *Id.; see also Lee v. Aiu,* 85 Hawai'i 19, 30–31, 936 P.2d 655, 666–67 (1997) (stating that "[i]n deciding a motion for directed verdict or JNOV, the evidence and the inferences which may be fairly drawn therefrom must be considered in the light most favorable to the nonmoving party and either motion may be granted only where there can be but one reasonable conclusion as to the proper judgment.") (quoting *Carr v. Strode,* 79 Hawai'i 475, 486, 904 P.2d 489, 500 (1995)). Therefore, a judgment as a matter of law requires the moving party to show, viewing all the evidence in the light most favorable to the party opposing the motion, that there is no evidence upon which the jury could decide in the non-moving party's favor.

We note the similarity between the Third Circuit's standard in granting a motion for judgment as a matter of law and our standard in granting a motion for summary judgment, which requires the moving party to show, viewing all the evidence in the light most favorable to the party opposing the motion, that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to a judgment as a matter of law. In any event, any distinction between a motion for judgment as a matter of law (or directed verdict) and a motion for summary judgment is not dispositive to our analysis or result in the instant case.

Golf Course purchase price was set at $25 million, which is the difference between the Fukuoka lenders' $65 million commitment and the $40 million allocated to settle the Hotel loans. In addition, the parties set the option price to allow TSA to buy the Hotel back from Shimizu for the same amount paid by Shimizu to resolve the Hotel loans (*i.e.*, $140 million). The option price would therefore allow Shimizu to be reimbursed and avoid any further losses on the Hotel project. Under these circumstances, the terms of the Basic Agreement were not based on fair market value. Instead, the Basic Agreement was effectuated by the parties in order to share the losses stemming from the project. Accordingly, the appraisal, which TSA alleges Shimizu withheld, is irrelevant to the terms of the Basic Agreement.

Second, TSA has not shown that the information contained in the undisclosed appraisals was unique or unavailable through other sources, or that the undisclosed materials were more reliable than those obtained by TSA. The record indicates that TSA requested and obtained a "comprehensive research and analysis" regarding the value of the Hotel. This analysis was prepared by The Halstrom Group, Inc., a real estate consulting and appraisal firm, over two years before the execution of the Basic Agreement.[6] According to the appraisal, the Hotel had a value of $271 million as of January 1, 1991. From a 1992 perspective, the value of the hotel was set at $306 million. Given this appraisal, the option price that allowed for TSA's repurchase of the Hotel could not have been based upon the Hotel's fair market value. Instead, the price of the option reflected the amount that would allow Shimizu to be reimbursed the additional funds it supplied to resolve the Hotel loans (*i.e.*, $140 million), thereby allowing Shimizu to avoid any further losses on the Hotel project. In exchange, TSA did not need to supply additional capital to resolve the Hotel loans. Given these circumstances, it is difficult to imagine that TSA's knowledge of the alleged undisclosed appraisal prepared at the request of Shimizu could either have induced action or forbearance by TSA.

### b. *The Projected Future Tax Consequences*

With regard to the undisclosed tax analysis, TSA could have easily obtained its own. Shimizu could not have had complete financial information on all of TSA's entities throughout the world. Without such information, any opinion regarding the tax consequences to TSA could not have been as reliable as an analysis based upon information supplied by TSA. Like the financial projections at issue in *Walter*, the projected tax consequences as to TSA constituted a mere estimate or projection of future tax consequences based on numerous assumptions.

In addition, the projected tax consequences of the Basic Agreement could only. have been a peripheral concern. Given that the loans to the Fukuoka lenders had become delinquent, TSA's primary objective in negotiating the terms of the Basic Agreement was to settle the loans regardless of the tax consequences. In exchange for what might have seemed an option price that was above the current market value of the property, TSA was able to resolve the delinquent loans for which it would have been liable without any additional capital contribution. Therefore, in light of the marginal relevance and unreliability of the information, as well as the availability of similar and more reliable information, the tax projections allegedly withheld were immaterial.

### c. *Equality of Bargaining Power*

Finally, we note that TSA was not in a position of inability to bargain fairly for the terms of the Basic Agreement. It is undisputed that: (1) Shimizu and TSA were general partners in the hotel and golf course partnerships; (2) under the partnership agreements, the restructuring and dissolution of the partnership could not be accomplished without TSA's consent; and (3) TSA had complete access to the partnership records at all relevant times, as guaranteed by Section 5.9(b) of the Limited Partnership

---

**6.** The February 20, 1991 appraisal of the Hotel was prepared by The Halstrom Group, Inc., at

the request of Hideki Hayashi, an official of TSA.

Agreement[7] and HRS § 425–119 (1993).[8] In addition, it is undisputed that TSA is comprised of eighty-two companies engaged in developing a variety of real estate projects throughout the world. Under these circumstances, it can hardly be said that TSA, as a general partner, did not have equal bargaining power in negotiating what amounted to be a real estate transaction.

Although TSA emphasizes that a Shimizu official urged Sekiguchi to "please trust us[,]" TSA had access to all relevant information—including an appraisal prepared by its own independent real estate consultant—that it needed to negotiate the terms of the Basic Agreement. TSA's failure to use the information it possessed as leverage in negotiating the terms of the Basic Agreement has no remedy in partnership law. As the Third Circuit aptly noted in *Walter*,

> Of course, we recognize that every negotiator would like to have all the information upon which his or her counterpart is proceeding, but that is a far cry from materiality in the legal sense. That depends, instead, on whether plaintiffs had access to the raw data upon which they could make their own projections. The record shows they did.

985 F.2d at 1243. Accordingly, in light of the equal bargaining power between TSA and Shimizu, the availability of similar information to TSA, and the fact that the alleged undisclosed information was not relevant or only marginally relevant to the Basic Agreement, we hold, viewing the evidence in the light most favorable to TSA, that Shimizu did not breach its fiduciary duty to disclose.

D. *Fraudulent Transfer—HRS ch. 651C*

TSA next argues that the circuit court erred in granting Shimizu's motion for summary judgment on TSA's claims for fraud on creditors. TSA maintains that it was enti-

tled to relief under the Uniform Fraudulent Transfer Act, HRS ch. 651C, because it was a "creditor that lent monies to WBPC, and since SCWA[, a Shimizu subsidiary,] was a general partner of WBPC, SCWA was liable to [TSA] . . . for the debts of WBPC." TSA arguments with regard to fraudulent transfer are without merit.

The Hawai'i Uniform Fraudulent Transfer Act provides remedies for "creditors" injured by "fraudulent transfers" of assets from debtor corporations. HRS § 651C–5(b) (1993) provides:

> A transfer made by a debtor is fraudulent as to a *creditor* whose claim arose before the transfer was made if the transfer was made to an insider for other than a present, reasonably equivalent value, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

(Emphasis added.) HRS § 651C–1 (1993) defines "creditor" as "a person who has a claim against a debtor."

The record reveals that TSA was not a "creditor" of Shimizu in this case. First, Shimizu was not a "debtor" of TSA, inasmuch as the initial $22 million investment that TSA alleges constitutes a debt was an investment in the WBPC partnership, of which TSA was a partner. Black's Law Dictionary 937 (6th ed.1990) defines a "loan" as a

> [d]elivery by one party to and receipt by another party of sum of money upon agreement, express or implied, to repay it with or without interest. . . . Anything furnished for temporary use to a person at his request, on condition that it shall be returned, or its equivalent in kind, with or without compensation for its use.

*See also Jahner v. Jacob*, 515 N.W.2d 183, 185 (N.D.1994) (noting that a valid, presently

---

7. Section 5.9(b) of the Limited Partnership Agreement between TSA and Shimizu, dated January 22, 1987, provides:

 The books of account of the Partnership shall be kept and maintained at all times at the principal place of business of the Partnership or at another place or places approved by the General Partners. Such books of account shall at all times be open to the reasonable inspec-

tion and examination of the Partners or their duly authorized representatives.

8. HRS § 425–119 provides:

 **Partnership books.** The partnership books shall be kept, subject to any agreement between the partners, at the principal place of business of the partnership, and every partner shall at all times have access to and may inspect and copy any of them.

enforceable debt against original transferor was an essential element of action against transferee to set aside fraudulent transfer). Inasmuch as Shimizu, a general partner in WBPC, never had an obligation to repay TSA its initial $22 million investment, TSA was not a creditor of Shimizu.

Second, even assuming that the $22 million investment constituted a loan to Shimizu, TSA's alleged "loan" was canceled prior to the time the allegedly fraudulent transfer occurred. Indeed, both Shimizu and TSA agreed to forfeit their initial investments as part of the dissolution of the partnerships. Because any "debt" was canceled prior to the alleged fraudulent transfer, there was no longer any obligation owing to TSA at the time of the transfer. Therefore, we hold that the circuit court did not err in determining that: (1) there was no genuine issue of material fact as to any actionable fraudulent "transfer" made by Shimizu as a debtor of TSA; and (2) Shimizu was entitled to judgment as a matter of law with regard to TSA's claims based upon fraudulent transfer.

### E. *Racketeer Influenced and Corrupt Organizations (RICO) Claims*

TSA next argues that the circuit court erred in granting Shimizu's motion for summary judgment with regard to TSA's civil RICO claim. TSA's argument is without merit.

To maintain a civil RICO claim based upon 18 U.S.C. § 1962(c) (1994), a plaintiff must prove the following elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). " 'Racketeering activity' is defined in 18 U.S.C. § 1961(1)(B) as including any act 'indictable' under certain enumerated federal criminal statutes, including 18 U.S.C. § 1341, which makes mail fraud a criminal offense, and 18 U.S.C. § 1342, which makes wire fraud a crime." *Schreiber Distrib. Co. v. Serv–Well Furniture Co., Inc.*, 806 F.2d 1393, 1399 (9th Cir.1986). In alleging mail fraud or wire fraud for purposes of establishing racketeering activity, a plaintiff must establish that: (1) the defendant(s) formed a

scheme to defraud; (2) the defendant(s) used the United States mails or caused a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud. *Id.* at 1399–1400 (citations omitted).

Inasmuch as we have held in section III.B. that there was no genuine issue of material fact establishing any alleged fraudulent activity by Shimizu, there is no evidence to support the underlying fraud claim required to establish the existence of racketeering activity. Therefore, we hold that the circuit court did not err in finding that: (1) TSA failed to establish there was a genuine issue of material fact as to Shimizu's commission of the predicate offenses alleged (mail and wire fraud); and (2) Shimizu was entitled to judgment as a matter of law.

### F. *Attorneys' Fees*

TSA next contends that the circuit court erred in granting Shimizu's entire request for attorneys' fees and costs. We agree.

Generally, under the "American Rule," each party is responsible for paying for his or her own litigation expenses. *Finley v. Home Ins. Co.*, 90 Hawai'i 25, 38, 975 P.2d 1145, 1158 (1998) (citing *Fought & Co., Inc. v. Steel Eng'g & Erection, Inc.*, 87 Hawai'i 37, 51, 951 P.2d 487, 501 (1998)). A notable exception to the "American Rule," however, is the rule that attorneys' fees may be awarded to the prevailing party where such an award is provided for by statute, stipulation, or agreement. *Lee v. Aiu*, 85 Hawai'i 19, 31–32, 936 P.2d 655, 667–68 (1997) (citation omitted); *S. Utsunomiya*, 76 Hawai'i at 399 n. 3, 879 P.2d at 504 n. 3; *Food Pantry, Ltd. v. Waikiki Business Plaza, Inc.*, 58 Haw. 606, 618, 575 P.2d 869, 878 (1978); *see also Forbes v. Hawai'i Culinary Corp.*, 85 Hawai'i 501, 946 P.2d 609 (App. 1997). HRS § 607–14 (Supp.1998) provides:

In all the courts, in all actions in the nature of assumpsit and in all actions on a promissory note or other contract in writing that provides for an attorney's fee, there shall be taxed as attorneys' fees, to be paid by the losing party and to be included in the sum for which execution

may issue, a fee that the court determines to be reasonable; provided that the attorney representing the prevailing party shall submit to the court an affidavit stating the amount of time the attorney spent on the action and the amount of time the attorney is likely to spend to obtain a final written judgment, or, if the fee is not based on an hourly rate, the amount of the agreed upon fee. The court shall then tax attorneys' fees, which the court determines to be reasonable, to be paid by the losing party; provided that this amount shall not exceed twenty-five per cent of the judgment.

Based upon this language, Shimizu, as the prevailing party, is entitled to collect attorneys' fees from TSA for work expended in this case insofar as this case is "in the nature of assumpsit."

█ This court has previously stated that "assumpsit" is "a common law form of action which allows for the recovery of damages for *non-performance of a contract,* either express or implied, written or verbal, as well as quasi contractual obligations." *Schulz v. Honsador,* 67 Haw. 433, 435, 690 P.2d 279, 281 (1984) (emphasis added). In deciding whether to award fees under HRS § 607–14, the court must determine the nature of the lawsuit where both assumpsit and non-assumpsit claims are asserted in an action. *Id.* at 436, 690 P.2d at 282 (citation omitted). Furthermore, in awarding attorneys' fees in a case involving both assumpsit and non-assumpsit claims, a court must base its award of fees, if practicable, on an apportionment of the fees claimed between assumpsit and non-assumpsit claims. *See Selvage v. J.J. Johnson & Assocs.,* 910 P.2d 1252, 1266 (Utah App.1996).

█ In this case, TSA's claims against Shimizu stem primarily from allegations of fraud, breach of fiduciary duty, and numerous statutory violations. Although Shimizu argues that TSA's claims are all predicated upon the Basic Agreement and the partnership agreement, TSA's claims do not involve monetary damages based upon the non-performance of a contractual or quasi-contractual obligation (*i.e.,* breach of contract). The mere fact that TSA's claims relate to a contract between the parties does not render a dispute between the parties an assumpsit action. Instead, TSA's claims for fraud and breach of fiduciary duty sound in tort.

In *Romero v. Hariri,* 80 Hawai'i 450, 459, 911 P.2d 85, 94 (App.1996), the Intermediate Court of Appeals (ICA) affirmed a trial court's denial of plaintiff's request for attorneys' fees. The plaintiff's complaint alleged, *inter alia,* causes of actions based upon fraud, breach of fiduciary duty, and violation HRS § 480–2 (1993) for fraudulent inducement in the execution of a real estate contract. *Id.* at 453, 911 P.2d at 88. In affirming the trial court, the ICA reasoned that the plaintiff's claims sounded in tort and that the complaint did not involve a dispute regarding breach of contract. *Id.* at 459, 911 P.2d at 94.

We find *Romero* directly apposite to this case. Like *Romero,* this case does not involve an attempt to collect money damages based upon breach of contract. In fact, it is undisputed in this case that there was no breach of either the Basic Agreement or partnership agreement. Instead, the dispute in this case stems from TSA's allegations that: (1) they were fraudulently induced by Shimizu to enter into the Basic Agreement; (2) Shimizu's nondisclosure of the appraisals, which constituted a breach of its fiduciary duty, caused TSA to mistakenly enter into the Basic Agreement; and (3) numerous statutory causes of action.[9] These considerations compel us to reverse the circuit court's award of fees.[10]

### G. *Shimizu's Motion to Expunge Lis Pendens*

Finally, in No. 21726, TSA contends that the circuit court erred by granting Shimizu's

---

9. Shimizu does not dispute TSA's contention that TSA's statutory causes of action (*i.e.,* securities violation under HRS ch. 485, fraud on creditors under HRS ch. 651C, unfair competition under HRS ch. 480, and RICO under 18 U.S.C. § 1962) do not authorize an award of fees to a successful defendant under these circumstances.

10. Although Shimizu did not include a discussion of HRCP Rule 54(d) in its answering brief, we affirm the circuit court's award of costs pursuant to HRCP Rule 54(d).

motion to expunge the *lis pendens* placed on the Hotel. TSA maintains that the circuit court lost jurisdiction to entertain Shimizu's motion to expunge the *lis pendens* after the notice of appeal in No. 21431 was filed. TSA further argues that, even if the circuit court had jurisdiction to hear Shimizu's motion to expunge the *lis pendens,* the circuit court erred in expunging the *lis pendens* because the complaint properly asserted a claim to title or possession of the Hotel. We disagree.

### 1. *Jurisdiction*

■ This court has long held that jurisdiction is "the base requirement for any court resolving a dispute because without jurisdiction, the court has no authority to consider the case." *Housing Finance & Dev. Corp. v. Castle,* 79 Hawai'i 64, 76, 898 P.2d 576, 588 (1995). With regard to appeals, "[t]he remedy by appeal is not a common law right and exists only by virtue of statutory or constitutional provision." *In re Sprinkle & Chow Liquor License,* 40 Haw. 485, 491 (1954). Therefore, "the right of appeal is limited as provided by the legislature and compliance with the methods and procedure prescribed by it is obligatory." *In re Tax Appeal of Lower Mapunapuna Tenants' Ass'n,* 73 Haw. 63, 69, 828 P.2d 263, 266 (1992).

■ In civil cases, HRS § 641–1(c) (1993) provides that appeals are to be taken in the manner and within the time specified by the rules of court. Specifically, Rule 3(a) of the Hawai'i Rules of Appellate Procedure (HRAP) (1996) provides that "[a]n appeal permitted by law ... shall be taken by filing a notice of appeal with the clerk of the court or agency." The effect of HRAP Rule 3(a) is to make the filing of a notice of appeal with the clerk of the circuit or district court the exclusive method of taking an appeal in all civil cases.

■ Generally, the filing of a notice of appeal divests the trial court of jurisdiction over the appealed case. *State v. Ontiveros,* 82 Hawai'i 446, 448–49, 923 P.2d 388, 390–91 (1996); *Richardson v. Sport Shinko (Waikiki Corp.),* 76 Hawai'i 494, 500, 880 P.2d 169, 175 (1994) (quoting *Territory v. Damon,* 44 Haw.

557, 561, 356 P.2d 386, 389 (1960)). Jurisdiction over the appealed case is transferred from the trial court to the supreme court at the time the notice of appeal is filed. *MDG Supply v. Diversified Investments, Inc.,* 51 Haw. 375, 381, 463 P.2d 525, 529 (1969), *cert. denied,* 400 U.S. 868, 91 S.Ct. 99, 27 L.Ed.2d 108 (1970). The principle governing the transfer of jurisdiction from the trial court to the appellate court is designed to avoid the confusion and inefficiency that might flow from placing the same issue before two courts at the same time. 9 J. Moore, *Moore's Federal Practice* ¶ 203.11 at 5–50 (2d ed.1996).

■ Notwithstanding the general effect of the filing of a notice of appeal, the trial court retains jurisdiction to determine matters collateral or incidental to the judgment, and may act in aid of the appeal. *See, e.g., Foggy v. Ralph F. Clark & Assoc., Inc.,* 192 Cal.App.3d 1204, 238 Cal.Rptr. 130 (1987); *In re Estate of Rice,* 130 Ill.App.3d 416, 85 Ill.Dec. 577, 473 N.E.2d 1382 (1985). For example, because the mere filing of a notice of appeal does not affect the validity of a judgment, the circuit court retains jurisdiction to enforce the judgment. *See MDG Supply,* 51 Haw. at 381, 463 P.2d at 529; *see also Life of the Land v. Ariyoshi,* 57 Haw. 249, 252, 553 P.2d 464, 466 (1976) (HRCP Rule 60(b) motion for correction, modification, or relief from judgment); HRAP Rule 10(e) (1996) (providing for correction or modification of the record on appeal).

■ In this case, Shimizu prevailed on all claims in the circuit court. Inasmuch as TSA failed to obtain any kind of judgment against Shimizu concerning the Hotel, which was the subject of the *lis pendens,* there was no claim to support the *lis pendens,* which was an encumbrance on the Hotel. In other words, the circuit court's granting of Shimizu's motions for summary judgment extinguished any claims TSA had against Shimizu. Although TSA filed a notice of appeal after the filing of the circuit court's judgment, it is undisputed that TSA did not prevail as to any of its claims. Given that the filing of a notice of appeal does not affect the validity of the circuit court's judgment, *see MDG Sup-*

*ply,* 51 Haw. at 381, 463 P.2d at 529, TSA's position that a losing party should be allowed to encumber the prevailing party's property simply because it has appealed from an unfavorable judgment is untenable. Under these circumstances, we hold that the circuit court's expungement of TSA's *lis pendens* on the Hotel was an exercise of the circuit court's power to enforce its judgment, which was in favor of Shimizu. Accordingly, the circuit court had jurisdiction to expunge the *lis pendens.*

### 2. *Expungement of the Lis Pendens*

TSA argues that, even if the circuit court had jurisdiction to expunge the *lis pendens,* the circuit court should have maintained the *lis pendens* because it was valid. We disagree.

■ HRS § 634–51 (1993) provides in relevant part:

> *In any action* concerning real property or affecting the title or the right of possession of real property, the plaintiff, at the time of filing the complaint, and any other party at the time of filing a pleading in which affirmative relief is claimed, or at any time afterwards, may record in the bureau of conveyances a notice of the pendency of the action, containing the names or designations of the parties, as set out in the summons or pleading, the object of the action or claim for affirmative relief, and a description of the property affected thereby. From and after the time of recording the notice, a person who becomes a purchaser or incumbrancer of the property affected shall be deemed to have constructive notice of the pendency of the action and be bound by any judgment entered therein if the person claims through a party to the action; provided that in the case of registered land, section 501–151 shall govern.

(Emphasis added.) Based upon this language, a *lis pendens* may only be filed *in connection with an action* (1) "concerning real property," (2) "affecting title" to real property, or (3) "affecting . . . the right of possession of real property." *S. Utsunomiya,* 75 Haw. at 505, 866 P.2d at 964 (quoting *Kaapu v. Aloha Tower Dev. Corp.,* 72 Haw.

267, 269–70, 814 P.2d 396, 397 (1991) (citing HRS § 634–51)) (emphasis added).

■ In *S. Utsunomiya,* this court construed HRS § 634–51 and summarized the basis of the common law *lis pendens* doctrine as follows:

> At common law under the doctrine of *lis pendens* the mere existence of a lawsuit affecting real property was considered to impart constructive notice that anyone who acquired an interest in the property after the suit was filed would be bound by any judgment in that suit.

*S. Utsunomiya,* 75 Haw. at 508, 866 P.2d at 951 (1994) (quoting *La Paglia v. Superior Court,* 215 Cal.App.3d 1322, 1326, 264 Cal. Rptr. 63, 66 (1989)) (brackets omitted). This court further noted that "[c]ourts and commentators acknowledged the doctrine's potentially harsh impact on innocent purchasers, but they willingly accepted this as a necessary concomitant to preserving the judicial power." *S. Utsunomiya,* 75 Haw. at 508, 866 P.2d at 965 (quoting *5303 Realty Corp. v. O & Y Equity Corp.,* 64 N.Y.2d 313, 320, 486 N.Y.S.2d 877, 882, 476 N.E.2d 276, 281 (1984)). Therefore, the doctrine of *lis pendens* protects a plaintiff from having his or her claim to the property defeated by the subsequent alienation of the property to a bona fide purchaser during the course of the lawsuit. *See S. Utsunomiya,* 75 Haw. at 508, 866 P.2d at 965 (citing *Kaapu,* 72 Haw. at 269, 814 P.2d at 397)

■ This court also observed in *S. Utsunomiya* that subsequent *lis pendens* statutes were intended "to ameliorate the harsh effect of the common law rule on third parties, [by] limit[ing] the legal fiction of 'constructive knowledge' of pending claims to those instances where a notice of *lis pendens* was recorded." 75 Haw. at 508–09, 866 P.2d at 965 (citations omitted). Therefore, this court concluded that "a narrow construction of Hawaii's *lis pendens* statute" was warranted "due to the real potential for abuse of [a] *lis pendens* ":

> [T]he practical effect of a recorded *lis pendens* is to render a defendant's property unmarketable and unsuitable as security for a loan. The financial pressure exerted

on the property owner may be considerable, forcing him [or her] to settle not due to the merits of the suit but to rid himself [or herself] of the cloud upon his [or her] title. The potential for abuse is obvious.

*Id.* at 512, 866 P.2d at 967 (quoting *La Paglia,* 215 Cal.App.3d at 1326, 264 Cal.Rptr. at 66 (citations omitted)). Accordingly, "the application of *lis pendens* should be limited to actions directly seeking to obtain title to or possession of real property." *Id.* at 510, 866 P.2d at 966; *see also Matter of 2003 and 2007 Ala Wai Blvd., City and County of Honolulu,* 85 Hawai'i 398, 944 P.2d 1341 (App.1997) (applying *S. Utsunomiya* ).

██ In this case, Shimizu moved to expunge the *lis pendens* filed by TSA on the Hotel after the circuit court entered judgment in Shimizu's favor. The effect of the circuit court's judgment was to extinguish any claims that TSA had against Shimizu. Given that the filing of an appeal to this court does not affect the validity of the judgment being appealed from, the *lis pendens* was no longer based on "any action concerning real property," inasmuch as TSA's claims against Shimizu had been extinguished. In other words, there was no basis to continue the *lis pendens,* which was an encumbrance on the Hotel, once all of TSA's claims against Shimizu were extinguished as a result of the circuit court's judgment. Therefore, the circuit court did not abuse its discretion in granting Shimizu's motion to expunge the *lis pendens.*

## IV. CONCLUSION

██ For the reasons discussed above, we reverse the circuit court's order granting Shimizu's motion for taxation of attorneys' fees. We affirm the circuit court's judgment in all other respects.[11]

---

11. In TSA's remaining points of error, TSA contends that the circuit court erred in granting summary judgment: (1) before it had been afforded discovery on its new claims; (2) on its unlawful/unfair competition claim under HRS § 480–2 (1993); and (3) on its claims for partial reformation and rescission. These points of error are without merit.

With regard to TSA's contention that summary judgment was granted before it had been afforded discovery on its new claims, the circuit court did not abuse its discretion inasmuch as the affidavit detailing the discovery it needed revealed that the documents sought had already been produced. Specifically, although TSA requested, *inter alia,* "[d]ocuments regarding a scheme by Defendants to defraud third-party creditors[,]" any such documents would have already been produced pursuant to the TSA's original fraud claim.

With regard to TSA's unfair/unlawful competition claim under HRS § 480–2, the circuit court did not err in granting summary judgment in favor of Shimizu inasmuch as TSA failed to present any evidence of how Shimizu's allegedly unfair method of competition adversely affected any of TSA's business relationships with any customer. *See Jenkins v. Commonwealth Land Title Ins. Co.,* 95 F.3d 791, 799 (9th Cir.1996); *see also* HRS § 480–3 (1993) (providing that HRS ch. 480 shall be construed in accordance with judicial interpretations of similar federal antitrust statutes.). Moreover, we have recently held that there is no private claim for relief under HRS § 480–13 (1993) for unfair methods of competition in violation of HRS § 480–2. *Robert's Hawai'i School Bus, Inc. v. Laupahoehoe Transp. Co., Inc.,* 91 Hawai'i 224, 252, 982 P.2d 853, 881 (1999).

Finally, with regard to TSA's claims for partial reformation and rescission, which are remedies of the underlying causes of action, the circuit court did not err in granting summary judgment in favor of Shimizu inasmuch as TSA's underlying claims were extinguished.